FIRST DIVISION

March 24, 2003

No. 1-02-0201 

MARTISSA BERRY, Indiv. ) Appeal from the

and as Mother and Next Friend ) Circuit Court of

of Jalen Charles, a Minor, ) Cook County

)

Plaintiffs-Appellees, )

)

) No. 99 L 13977

)

WEST SUBURBAN HOSPITAL MEDICAL )

CENTER, a Corporation, )

)

Defendant-Appellant )

)

(Amy LaHood, Karla Clark, )

and Bertha Lopez, ) Honorable

) Michael J. Hogan,

Defendants). ) Judge Presiding. 

JUSTICE SMITH delivered the opinion of the court:

Defendant-appellant West Suburban Hospital Medical Center (the Hospital) contends that a certain document plaintiffs requested in discovery 
is protected by sections 8-2101 through 8-2105 of the Code of Civil Procedure (735 ILCS 5/8-2101 
et
 
seq
. (West 1998)) (hereinafter the Medical Studies Act
 or the Act).  The Hospital contends
 that (1) the trial court should not have ordered it to produce that document and (2) this court should vacate the trial court's order finding the Hospital in contempt for refusing to produce that document.  We affirm the trial court's finding that the document should be produced but vacate the trial court's finding of contempt.

BACKGROUND

Plaintiffs Martissa Berry and Jalen Charles
 
filed a medical negligence complaint against defendants West Suburban Hospital Medical Center
, Amy LaHood, M.D., Karla Clark, M.D., and Bertha Lopez, M.D., arising from the obstetrical care defendants provided to plaintiffs during labor and delivery.  Plaintiffs alleged that on September 13, 1999, Berry was experiencing contractions and was admitted to the Hospital but then discharged with instructions to return when her contractions became more frequent.  After Berry was readmitted to the Hospital on September 14, 1999, an emergency caesarean section was performed, and Charles was born with disabilities.

Plaintiffs alleged that Charles's disabilities resulted from defendants' negligence.  Specifically, plaintiffs alleged that defendants negligently (1) discharged Berry on September 13, 1999, despite purported evidence of fetal distress; (2) failed to timely administer intrapartum antibiotics to Charles; (3) failed to monitor the progress of Berry's labor or Charles's well-being; and (4) failed to timely perform the emergency caesarean section.

During the course of discovery, plaintiffs requested documents from the Hospital.  The Hospital disclosed the existence of four documents within the scope of plaintiffs' discovery request.  One of the four was a letter from Dr. Lopez to Vasant Acharya, M.D., chairperson of the Hospital's department of obstetrics and gynecology
, dated September 16, 1999 (September 16 letter).
(footnote: 1)  
The Hospital, however, declined to provide the documents, contending that the documents were protected from disclosure under the Act.  Plaintiffs filed a motion to compel the documents and requested that the documents be made available for an 
in
 
camera
 inspection by the trial court.  Defendants filed in opposition a response that included the affidavits of Dr. Lopez and Dr. Acharya.  Furthermore, defendants agreed to provide the documents to the trial court under separate, sealed cover for 
in
 
camera
 inspection.

The September 16 letter at issue on appeal began: "Dr. Acharya:  This note is to inform you of the events that occurred on the morning of September 14, 1999."  Dr. Lopez then made factual statements relating to Berry's medical condition and the sequence of events surrounding her treatment while at the hospital.  The September 16 letter was not addressed to and did not refer to any hospital investigatory committee.

In her affidavit dated October 5, 2001, Dr. Lopez stated that her purpose in writing the September 16 letter to Dr. Acharya was to "bring potential issues to his attention concerning quality improvement at the hospital for the purpose of reducing morbidity and mortality."  According to Dr. Lopez, she understood that the issues raised in her letter would then be addressed by the Hospital's quality assurance committee.  Dr. Lopez also understood that her letter to Dr. Acharya "would be privileged since it addressed internal quality assurance issues at the hospital."

In his affidavit dated October 29, 2001, Dr. Acharya stated that it was his duty to oversee quality assurance and improvement issues within the obstetrics and gynecology department and to oversee the department's quality management program.  The program's purpose was to identify areas of care that needed improvement and to reduce morbidity and mortality within the department.  As part of the program, the department reviewed various patient cases.  According to Dr. Acharya, to facilitate the quality assurance process, department physicians and nurses were responsible for informing Dr Acharya, either verbally or in writing, of patient cases with potential quality assurance issues.  Dr. Acharya stated that the "initial communication from the physician and/or nurse begins the quality assurance process," whereupon the "patient's chart is reviewed and the case is discussed at a monthly morbidity and mortality (M&M) review meeting" of the department.  Dr. Acharya stated that the September 16 letter notified him of potential quality assurance issues in the care of Berry and began the quality assurance review of Berry's case.

The record does not include a transcript of the hearing on plaintiffs' motion to compel and does not indicate whether the trial court conducted an 
in
 
camera
 inspection of the disputed discovery documents.  
On November 21, 2001, the trial court ordered the Hospital to produce the September 16 letter but denied plaintiffs' motion to compel production of the other three documents.  After the Hospital refused to produce the September 16 letter, 
the trial court held the Hospital in contempt and fined it $10.  This appeal followed.

ANALYSIS

The Hospital contends on appeal that the September 16 letter is privileged under the Act because it triggered the internal quality control proceedings regarding Berry's case.  The Hospital argues that the letter is privileged as a report or statement used in the course of internal quality control.  We disagree.

The Medical Studies Act Privilege

The Act provides:

"All information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, or other data of * * * committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees, or their designees (but not the medical records pertaining to the patient), used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, shall be privileged, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges or agreements for services * * *."  735 ILCS 5/8-2101 (West 1998).

The Act further provides that such privileged material "shall not be admissible as evidence, nor discoverable in any action of any kind in any court or before any tribunal, board, agency or person."  735 ILCS 5/8-2102 (West 1998).

The burden of establishing the applicability of this statutory privilege is on the party seeking to invoke the privilege.  
Roach v. Springfield Clinic
, 157 Ill. 2d 29, 41 (1993).  Whether the privilege applies is a matter of law, and our standard of review is 
de
 
novo
.  
Niven v. Siqueira
, 109 Ill. 2d 357, 368 (1985). 
 However, the question of whether specific materials are part of an internal quality control or a medical study is a factual question and will not be reversed on review unless it is against the manifest weight of the evidence.  
Chicago Trust Co. v. Cook County Hospital
, 298 Ill. App. 3d 396, 401 (1998).
 

The purpose of the Act is to ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of improving hospital conditions and patient care or reducing the rates of death and disease.  
Roach
, 157 Ill. 2d at 40.  The Act is premised on the belief that, absent a peer-review privilege, physicians would be reluctant to sit on peer-review committees and engage in candid evaluations of their colleagues.  
Roach
, 157 Ill. 2d at 40.

The Hospital argues that the September 16 letter is privileged because Dr. Lopez wrote it to begin the quality review process and understood its contents would be privileged and confidential.  The Hospital asserts that the application of the privilege to the September 16 letter is consistent with the Act's purpose to encourage candid and voluntary peer-review programs to improve hospital conditions and patient care and to reduce the rates of death and disease.  We disagree.

Even if the September 16 letter notified Dr. Acharya on behalf of the investigatory committee of a potential quality control issue, the Act's privilege does not apply because the September 16 letter was information of the Hospital's staff rather than information of any committee, peer-review or otherwise.
  
Roach
, 157 Ill. 2d at 39 (
"What the [Act] actually protects is not information of a hospital's medical staff, but information of '
committees
 of licensed or accredited hospitals or their medical staffs * * *.' (Emphasis added.) [Citation.]").  According to the record, the earliest indication of any peer-review committee meeting in the Berry case was February 11, 2000, which was several months after Dr. Lopez wrote the September 16 letter
.

Our supreme court addressed a similar appeal in 
Roach
, where the plaintiffs alleged that their child's birth defects resulted from an unreasonable delay in providing the mother's anesthesia.  157 Ill. 2d at 35-36.  A couple of days after the child's birth but before the monthly meeting of the hospital's peer-review committee, the hospital's chief anesthesiologist spoke with a nurse and a nurse anesthetist about the cause of the alleged delay.  
Roach
, 157 Ill. 2d at 36-38.  With respect to those conversations, the chief anesthesiologist stated in his deposition that his specific purpose as the department chairperson had been "'[t]o determine if there was a problem, and if there was a problem, to help find ways to improve things; quality control.'"  
Roach
, 157 Ill. 2d at 39.  Following those conversations, the chief anesthesiologist "'made a report to the Department of Anesthesia  meeting.'"  
Roach
, 157 Ill. 2d at 39.

At trial, the 
Roach
 plaintiffs called as a witness the nurse anesthetist, who referred to the aforementioned conversation with the chief anesthesiologist.  
Roach
, 157 Ill. 2d at
 36.  The defense then objected, and the 
trial court sustained that objection and refused to allow the nurse anesthetist to testify about his conversation with the chief anesthesiologist, finding that it was privileged under the Act.  
Roach
, 157 Ill. 2d at 
37.  On appeal, our supreme court held that the trial court erroneously excluded that evidence.  
Roach
, 157 Ill. 2d at 32.

The 
Roach
 court held that the information obtained by the chief anesthesiologist (1) was not privileged under the Act because it was not "'information of' 
any
 committee, peer-review or otherwise" and (2) "was not transformed into 'information of'" a department or committee merely because the chief anesthesiologist reported the incident to a peer-review body sometime later.  (Emphasis in original.)  
Roach
, 157 Ill. 2d at 40-41.  The 
Roach
 court reasoned that to hold otherwise would completely subvert the purpose of the Act to promote improved patient care because hospitals could then foreclose disclosure of virtually all adverse facts known to its medical staff.  157 Ill. 2d at 41.

Because the information sought in 
Roach
 
was not information of any committee, our supreme court found it unnecessary to definitively resolve the issue of whether a hospital's committee must be involved in the peer-review process before the privilege will attach.  
Roach
, 157 Ill. 2d at 40.  The 
Roach
 court noted, however, 
that the legislative debate and case law concerning the Act suggested that when the committee is comprised of a hospital's medical staff, "the committee 
must be involved in the peer-review process
 before the privilege will attach."  (Emphasis added.)  
Roach
, 157 Ill. 2d at 40.

Subsequently, this court interpreted the Act to limit the privilege to the mechanisms of the peer-review process--
i.e.
, information initiated, created, prepared or generated by a peer-review committee, including information gathering and deliberation leading to the committee's ultimate decision.  
Chicago Trust Co.
, 298 Ill. App. 3d at 402 (reports prepared shortly after the incident and used by the oversight committee to review that incident were not privileged where the reports were not requested by–-and thus did not belong to-–a committee
 engaged in the peer-review process); 
Grandi v. Shah
, 261 Ill. App. 3d 551, 556 (1994) (even assuming that a
 hospital administrator's conversations with a doctor and nurse to investigate a patient complaint were part of the hospital's internal review process, those conversations were not protected because the administrator was not acting on behalf of any peer-review committee).

Here, the Hospital attempts to distinguish 
Roach
 by suggesting that the September 16 letter marked the beginning of the peer-review process–-and thus was part of that process--because Dr. Lopez wrote the letter in response to established Hospital policy that staff was responsible for notifying the quality control committee of potential issues.

In 
Roach
, the defendant hospital made a similar argument–-
i.e.
, that the chief anesthesiologist's conversations with two medical staff members were tantamount to an investigation by a committee and thus were part of the peer-review process.  T
he 
Roach
 court, however, rejected that argument
, noting that the chief anesthesiologist
 spoke to those staff members
 before the department was notified of the problem; that there was no legal principle warranting imputing the chief anesthesiologist
's actions to the department simply because he served as its chairperson; that the department, as a body, was charged with the responsibility for conducting medical reviews at monthly meetings; and that the hospital's bylaws contained no provision conferring on the chairperson or any individual the authority to act for the department.  
Roach
, 157 Ill. 2d at 42-43.

For these same reasons, we reject the Hospital's assertion that Dr. Lopez's September 16 letter was protected as part of the peer-review process.  Clearly, Dr. Lopez, who had no similar position of authority as the chief anesthesiologist in 
Roach
, cannot successfully argue that she was acting on behalf of the department or a committee to investigate the Berry case where the Hospital concedes that the department was not aware of the problem until Dr. Lopez's September 16 notification and where the peer-review committee met several months after Dr. Lopez wrote the September 16 letter.

The Hospital also contends that 
Roach
 is not relevant, arguing that 
Roach
 (1) did not address a writing submitted to a peer-review committee to initiate its proceedings, and (2) merely stands for the proposition that information does not become privileged simply because a written report containing it might be privileged.
  The application of the privilege under the Act is not based on whether the information is verbal or written; under the express terms of the statute, the privilege, where it exists, extends to "[a]ll information, interviews, reports, statements, memoranda * * * or other data."  735 ILCS 5/8-2101 (West 1998).  Moreover, the Hospital ignores the 
Roach
 court's holding 
that the Act does not protect information of a hospital's medical staff, but information of its committees.  The Hospital also ignores the 
Roach
 court's extensive discussion and rejection of the argument that an investigation initiated and conducted by a department chairperson was tantamount to an investigation by a committee of that department.

The September 16 letter was not initiated, created or generated by a peer-review committee.  The letter was written prior to the commencement of the peer-review process as a means to bring to Dr. Acharya's attention a potential quality issue.  
Based on our careful review of the record, we find that the trial court properly ordered the Hospital to produce the September 16 letter.

Contempt

As a final matter, we address the trial court's contempt order.  Requesting the trial court to enter a contempt order is a proper procedure to seek immediate appeal of a trial court's discovery order.  
Green v. Lake Forest Hospital
, 335 Ill. App. 3d 134, 139 (2002); 
Buckman v. Columbus-Cabrini Medical Center
, 272 Ill. App. 3d 1060, 1067 (1995).  In this case, we find that the Hospital's decision not to produce the September 16 letter was made in good faith.  The Hospital was not contemptuous of the trial court's authority but merely sought appellate review of its unsuccessful assertion of privilege.  
Green
, 335 Ill. App. 3d at 139.  We therefore vacate the trial court's contempt order and fine.  
Chicago Trust Co.
, 298 Ill. App. 3d at 410.

CONCLUSION

The trial court correctly overruled the Hospital's objections to producing the September 16 letter.  The contempt order is vacated.  We return the sealed document to the trial court for proceedings consistent with this order.

Affirmed in part and vacated in part; cause remanded.

GORDON, P.J. and McNULTY, J., concur.

FOOTNOTES
1:  The three other documents were (1) Dr. Acharya's letter to Dr. Lopez, dated February 18, 2000, which was written after a morbidity and mortality review meeting held February 11, 2000; (2) Dr. Lopez's letter to Dr. Acharya, dated March 3, 2000, which was written at the request of the morbidity and mortality review committee; and (3) a Multidisciplinary Case Review Report.