# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Kopolovic v. Shah*, 2012 IL App (2d) 110383

---

| | |
|---|---|
| Appellate Court Caption | RICHARD KOPOLOVIC, Plaintiff-Appellant, v. KAMLESH SHAH and MIDWEST CENTER FOR DAY SURGERY, LLC, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-11-0383 |
| Filed | March 12, 2012 |
| Rehearings denied | April 16, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for defamation and false light invasion of privacy, the entry of summary judgment for defendants on the grounds that the individual defendant's memorandum concerning surgical procedures performed by plaintiff was privileged under the Medical Studies Act, it was protected by a common-law conditional privilege and the content was substantially true was reversed and the cause was remanded, since the Act did not apply where the memorandum was not generated as a result of an investigation by a peer review committee or in the course of a quality-control process at the medical center where the procedure was performed, plaintiff raised a question of fact as to whether the common-law conditional privilege applied by arguing that defendants failed to properly investigate the truth of the statements made and did not properly limit the memorandum's scope, and factual questions existed as to the substantial truth of the charges in the memorandum. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 07-L-1135; the Hon. Hollis L. Webster, Judge, presiding. |

| Judgment | Reversed and remanded. |
|---|---|
| Counsel on Appeal | Frederic A. Mendelsohn and Alexander D. Marks, both of Burke, Warren, MacKay & Serritella, P.C., of Chicago, for appellant. |
| | Norman J. Barry, Jr., of Donohue, Brown, Mathewson & Smyth LLC, of Chicago, for appellee Kamlesh Shah. |
| | John J. Reidy and Todd M. Porter, both of Ruff, Weidenaar & Reidy, Ltd., of Chicago, for appellee Midwest Center for Day Surgery, LLC. |
| Panel | JUSTICE SCHOSTOK delivered the judgment of the court, with opinion. Justices Bowman and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    The plaintiff, Dr. Richard Kopolovic, brought suit against Dr. Kamlesh Shah and the Midwest Center for Day Surgery, LLC (MCDS), alleging that communications by Dr. Shah had defamed Dr. Kopolovic and subjected him to a false light invasion of privacy, that Dr. Shah was the agent of MCDS, and that MCDS had been negligent in its handling of the matter. The trial court granted summary judgment in favor of the defendants on the grounds that (1) the communications at issue were privileged by section 8-2101 of the Code of Civil Procedure (known as the Medical Studies Act) (735 ILCS 5/8-2101 *et seq*. (West 2008)); (2) the communications were also protected by a common-law conditional privilege; and (3) the statements in the communications were substantially true. Dr. Kopolovic appealed. We reverse and remand.

¶ 2                              BACKGROUND

¶ 3    The following facts are drawn primarily from the deposition testimony and exhibits submitted by the parties in connection with the defendants' motions for summary judgment and, except as noted, are undisputed. The facts provided here are only an outline; additional facts pertinent to specific legal arguments are discussed in conjunction with those arguments.

¶ 4    MCDS operated a surgery center in Downers Grove. Dr. Shah, an anesthesiologist, was an employee of Anesthesia Services, Ltd., a group of anesthesiologists who had a contract with MCDS to provide anesthesiology services at MCDS. Dr. Shah had staff privileges at MCDS, and MCDS did the billing for all of the services Dr. Shah performed at MCDS. Dr. Kopolovic was a plastic surgeon who performed procedures at MCDS and at other medical facilities in the Hinsdale area.

¶ 5        On April 26, 2007, Dr. Kopolovic wrote to the insurer of a female patient who had been diagnosed with an umbilical hernia, seeking advance authorization for two surgical procedures: repair of the hernia and "excision and revision to correct the abdominal wall deformity." The "abdominal wall deformity" was two old scars from a Caesarian section and an appendectomy.

¶ 6        On May 8, 2007, Dr. Kopolovic performed the abdominal surgery and two other, unrelated, cosmetic procedures on the patient at MCDS. Dr. Shah was the anesthesiologist for the surgery. The patient's surgical consent form listed three scheduled procedures, including the hernia repair and the two unrelated cosmetic procedures, but did not list the excision of the old scars. The surgery took several hours. When Dr. Kopolovic was completing the hernia repair, he removed "excess lower abdominal skin and fat" in closing the incision. Dr. Kopolovic and his expert witness contended that this removal was a normal part of the closure of an umbilical hernia repair incision. Dr. Kopolovic's postoperative report listed four surgical procedures: the two unrelated cosmetic procedures, the hernia repair, and "excision of multiple abdominal scars and repair and revision." The hernia repair was billed to the patient's insurer, while the cosmetic procedures were paid for by the patient in advance. There is no suggestion in the record that the patient suffered any adverse consequences from the surgery or was dissatisfied with any aspect of it.

¶ 7        Dr. Shah, however, apparently became concerned that, in light of the manner in which the surgery and closure were performed by Dr. Kopolovic, the surgery was in fact an abdominoplasty (a cosmetic procedure commonly known as a "tummy tuck") rather than the repair of an umbilical hernia. Dr. Shah voiced his concerns to Dr. Griesemer, the chair of the anesthesia department at Advocate Good Samaritan Hospital in Hinsdale. Dr. Griesemer told Dr. Shah to talk to Dr. John Martucci, the chair of Anesthesia Services' MCDS practice and a member of the MCDS board of directors. On Dr. Martucci's advice, Dr. Shah also spoke with Dr. John Wander, the president of the MCDS board. He spoke with Dr. Wander at least twice between May 8 and May 16, 2007. Dr. Wander advised Dr. Shah that if he had any concerns about anything, he should put them in writing and bring them to the board's attention.

¶ 8        Dr. Shah drafted a memorandum, which was eventually typed up on the letterhead of Advocate Good Samaritan Hospital and read as follows:

"To: The Board Members and Consulting Committee at [MCDS]

From: Dr. Kamlesh Shah

Date: May 16, 2007

Re: Unethical Practice at [MCDS]

Cc: Dr. Frank Madda, Dr. John Wander, Dr. John Martucci, Dr. Jane Dillon, Dr. Richard Bulger, Dr. Kopolovich [*sic*]

Dear Sir/s, Madame,

        I would like to bring your attention [*sic*] a case that I happened to be involved with on May 7 [*sic*], 2007 at [MCDS]. This is regarding *** a 46 year old female who underwent cosmetic surgery at [MCDS]. Dr. Kopolovich [*sic*] performed the surgery.

The patient was scheduled for 5 hours of procedure–(liposuction, blepharoplasty, and umbilical hernia repair). As I observed, the patient had minimal or no umbilical hernia but underwent full addominoplasty [*sic*]–disguised as umbilical hernia repair. As opposed to the usual and customary practice of patient making full advanced [*sic*] payments to the center and to the Anesthesiologist, only partial payment was collected from the patient as part was billed to the insurance company for the repair of the umbilical hernia. Financial arrangements aside, I think it is unethical to perform a surgery which is not on the consent or on the schedule. In my opinion this is a deceptive practice that needs to be brought to the attention of the consulting committee and the board of directors at [MCDS].

When I asked the nurses about how the center could allow this kind of deceptive practice, they told me that this is not the first time and not the first plastic surgeon involved. In the past, other cosmetic surgeons also have done something similar. With this conversation, I felt compelled to bring this to everyone's attention. I don't have anything personal against any of the individuals involved in this but am writing this to stop this unethical and deceptive practice which can also be a cause for legal actions against the center and all other individuals involved by either the insurance company and/or patients.

Thank you for your attention to this matter.

Sincerely, [signature] Dr. Kamlesh Shah"

Dr. Shah did not review the patient's medical file, the billing records, or the records relating to the surgery before creating the memorandum.

¶ 9 Dr. Shah distributed the memorandum in sealed envelopes to persons whose names were given to him by Drs. Martucci and Wander, although at the time of his deposition he did not recall who those persons were. MCDS's board of directors had physician and nonphysician members; there is no evidence regarding whether all members of the board received the memorandum. Further, although the memorandum was also addressed to the consulting committee of MCDS, a body that served as a peer review and credentialing committee for MCDS, the record does not reflect whether the members of that committee (who are almost wholly distinct from the persons on the board of MCDS) actually received the memorandum.[1] Similarly, although Dr. Kopolovic was listed among the persons copied on the memorandum, he testified that he did not receive the memorandum until June 20, 2007, when Dr. Dillon (the medical director of MCDS, a member of the MCDS board, and the chair of its consulting committee) provided a copy to him.

¶ 10 When Dr. Dillon received the memorandum in her mailbox at Advocate Good Samaritan Hospital, she undertook to investigate it because as medical director of MCDS she was responsible for investigating incident reports such as the memorandum. Thereafter, she spoke with Dr. Kopolovic on the telephone and met with him on June 20, 2007, when she gave him the memorandum. She also met with him a few days later, at which point he showed her

[1]On May 16, 2007, the date of the memorandum, the consulting committee renewed Dr. Kopolovic's privileges with MCDS.

intra-operative photos. Dr. Dillon asked Dr. Kopolovic to attend the June 25, 2007, board meeting, but he was unable to do so as he was leaving the country for a scheduled family vacation. Thereafter, communications broke down. Dr. Kopolovic never appeared before the board and, according to Drs. Dillon and Wander, the board's investigation of the issues raised in the memorandum is still pending. Dr. Kopolovic filed the present suit against Dr. Shah and MCDS on October 29, 2007.

¶ 11    For the purposes of this appeal, the relevant complaint is the second amended complaint, filed on October 7, 2009. Counts I and II were against Dr. Shah, claiming that he had engaged in defamation *per se* and false light invasion of privacy. Counts III and IV were against MCDS. Count III alleged that Dr. Shah was an agent of MCDS and that MCDS was vicariously liable for Dr. Shah's torts. Count IV alleged that MCDS was directly liable in negligence because it owed Dr. Kopolovic a duty of care, relating to its investigation of the memorandum, which it breached.

¶ 12    In July 2010, Dr. Shah and MCDS each filed a motion seeking summary judgment. They argued that Dr. Shah's memorandum was protected by the Medical Studies Act (735 ILCS 5/8-2101 *et seq*. (West 2008)); it was also protected by a common-law conditional privilege; and it was substantially true. These arguments were directed toward the defamation claim; the defendants argued that the other claims could not stand if the memorandum was found to be privileged or otherwise not defamatory. In addition, MCDS argued that Dr. Shah was not its employee and that it therefore could not be vicariously liable for his actions, and that it had not been negligent. The motions were fully briefed, with substantial deposition testimony presented by both parties in support of their arguments. In addition to the testimony described above, Dr. Shah's expert witness opined that Dr. Kopolovic had performed an abdominoplasty on the patient and had conspired with the patient to bill the procedure as an umbilical hernia repair, thereby defrauding the insurance company, MCDS, and Dr. Shah. Dr. Kopolovic's expert witness opined to the contrary that the removal of excess fat and skin from the patient was a normal and expected part of an umbilical hernia repair. On January 11, 2011, the trial court heard oral argument. Immediately following oral argument, the trial court granted the motions for summary judgment "for the reasons set forth in the record," which were as follows: (1) the memorandum was privileged under the Medical Studies Act; (2) it was also conditionally privileged; and (3) it was substantially true. The trial court stated that it was required to apply the "innocent construction" rule in assessing whether the memorandum was substantially true and that the application of this rule led to its conclusion regarding substantial truth. Dr. Kopolovic filed a motion to reconsider, which the trial court denied. He also sought leave to file a third amended complaint to assert a claim of defamation *per quod*; this request too was denied. He timely filed a notice of appeal.

¶ 13                                                      ANALYSIS

¶ 14    In his appeal, Dr. Kopolovic argues that the trial court erred in granting summary judgment in favor of the defendants and that, even if this action were correct, the trial court should have permitted him to file an amended complaint. We take each argument in turn.

¶ 15    "The purpose of summary judgment is to determine whether a genuine issue of material fact exists, not to try a question of fact." *Thompson v. Gordon*, 241 Ill. 2d 428, 438 (2011). Therefore, summary judgment is proper only when the pleadings, depositions, and admissions on record, together with any affidavits, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005 (West 2008); *Gaylor v. Village of Ringwood*, 363 Ill. App. 3d 543, 546 (2006). "In determining whether a genuine issue as to any material fact exists, a court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent." *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43 (2004). A triable issue precluding summary judgment exists where material facts are disputed or where the material facts are undisputed but reasonable persons might draw different inferences from the undisputed facts. *Id*. In considering whether summary judgment is proper, a court does not assess the credibility of the testimony presented but rather determines only whether the evidence presented was sufficient to create an issue of fact. *Jackson v. Graham*, 323 Ill. App. 3d 766, 779 (2001). We review the grant of summary judgment *de novo. Ioerger v. Halverson Construction Co.*, 232 Ill. 2d 196, 201 (2008).

¶ 16    In this case, the trial court listed three bases for its determination that the defendants were entitled to summary judgment: the memorandum was protected by an absolute privilege under the Medical Studies Act; it was also protected by a common-law conditional privilege; and it was substantially true. We begin with the applicability of the Medical Studies Act.

¶ 17                              Medical Studies Act

¶ 18    The Act states, in relevant part:

"All information, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, or other data of *** committees of ambulatory surgical treatment centers or post-surgical recovery centers or their medical staffs, or committees of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees, or their designees ***, used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care *** shall be privileged ***." 735 ILCS 5/8-2101 (West 2008).

The Act further provides that such privileged material "shall not be admissible as evidence *** in any court or before any tribunal, board, agency or person." 735 ILCS 5/8-2102 (West 2008).

¶ 19    The purpose of the Act is not to shield hospitals from liability, but to ensure that physicians will engage in effective examination of their peers in order to advance the quality of health care. *Roach v. Springfield Clinic*, 157 Ill. 2d 29, 41-42 (1993). In accordance with this purpose, the Act does not protect all information used for internal quality control or peer review, but only the "information of" the committees described in the Act. *Id*. at 39. "Information of" has a specific meaning here: it encompasses only information "initiated,

-6-

created, prepared or generated by" a peer-review or quality-control committee. *Pietro v. Marriott Senior Living Services, Inc.*, 348 Ill. App. 3d 541, 549 (2004). Information generated or created before the time that the relevant committee became aware of the incident that the information relates to, or before the committee met to address the incident, is not "information of" the committee and cannot be made privileged by its later submission to the committee. *Roach*, 157 Ill. 2d at 41. "If the simple act of furnishing a committee with earlier-acquired information were sufficient to cloak that information with the statutory privilege, a hospital could effectively insulate from disclosure virtually all adverse facts known to its medical staff ***." *Id*. Such a broad interpretation of the privilege would make it substantially more difficult for patients to hold hospitals and similar medical organizations responsible for medical malpractice, which would decrease the incentive of those institutions to pursue the goal of improved patient care, thereby subverting the purpose of the Act. *Id*. at 41-42. Accordingly, Illinois courts have long held that information regarding an incident that is generated prior to the relevant committee's decision to review the incident is not protected by the Act. *Pietro*, 348 Ill. App. 3d at 550.

¶ 20    The party seeking to invoke the privilege created by the Act has the burden of establishing that the privilege applies. *Roach*, 157 Ill. 2d at 41. Whether the privilege applies is a question of law, which we review *de novo*, although the question of whether the specific communications at issue are part of a peer review or medical study covered by the Act is a question of fact within that legal determination. *Niven v. Siqueira*, 109 Ill. 2d 357, 368 (1985); *Chicago Trust Co. v. Cook County Hospital*, 298 Ill. App. 3d 396, 401 (1998).

¶ 21    Here, Dr. Shah was the source of the memorandum at issue. It is undisputed that Dr. Shah was not a member of any peer-review or quality-control committee at MCDS. Thus, on its face, the memorandum does not fall within the information made privileged by the Act. Both Dr. Shah and MCDS argue, however, that the memorandum is nevertheless protected by the Act because Dr. Shah was engaged in an attempt to bring to light practices he viewed as unethical and potentially detrimental to patients (among others). As the purpose of the Act is to protect physicians who seek to further the ends of better patient care, they argue that the memorandum falls squarely within the intended protections of the Act.

¶ 22    Although there is a certain logic to this argument, it has been repeatedly rejected by Illinois courts, most notably by our supreme court in *Roach*. *Roach* was a medical malpractice case in which the plaintiffs (the parents of a baby born with cerebral palsy and brain damage) deposed the physician who was the chair of the anesthesia department for the defendant hospital. (At the start of the emergency Caesarian section, there had been a delay in the arrival of the anesthesiologist and the nurse anesthetist.) The physician had spoken with a nursing supervisor in the obstetrics department about the circumstances surrounding the birth, and the plaintiffs asked him about these conversations during the deposition. On the instructions of his attorney, the physician declined to answer questions regarding the conversations on the ground that they were privileged under the Act. The defendant hospital argued that, as the physician was the chair of the anesthesia department, he was responsible for investigating potential problems in the delivery of anesthesia services and ensuring that such problems were corrected. After he spoke with the nursing supervisor, the physician made a report regarding the incident at a meeting of the anesthesia department, although

there was no evidence as to exactly what was reported or how (or even if) the report drew on what the physician learned from the nursing supervisor.

¶ 23   In addition, at trial the plaintiffs sought to question a nurse anesthetist regarding a conversation he had with the same physician about the birth. The defendant hospital objected. In an offer of proof, the nurse anesthetist testified that the physician approached him a few days after the birth and told him that a delay in paging the anesthesia team had occurred because one or two new secretaries in the obstetrics department did not know the best or proper way to page the team. The trial court sustained the objection and excluded the evidence on the ground that it was covered by the Act. The jury returned a verdict in favor of the defendants, including the hospital, and the plaintiffs appealed. The appellate court affirmed on the basis that, because the physician was pursuing the goal of quality control within his department when he held the conversations with the nurse anesthetist and the nursing supervisor, those conversations were privileged under the Act.

¶ 24   The supreme court rejected this argument. It found that the Act covered only information meeting the statutory requirements–that is, information generated or created by a committee already engaged in a peer-review or a quality-control process with regard to the specific incident. *Roach*, 157 Ill. 2d at 39. Interpreting the Act broadly, to cover any information related to the goal of improving patient care even if that information was not the "information of" a committee described in the statute, would subvert its purpose. *Id.* at 41-42. Because there was no dispute that the conversations at issue had not been initiated by any peer-review or quality-control committee, the conversations were not protected by the Act. *Id.* at 40. Nor did the fact that the physician's conversations might later have been shared with the anesthesia department (which could be broadly viewed as a quality-control committee) mean that the information became protected. "The information obtained *** in the course of his conversations was not transformed into 'information of' the anesthesiology department merely because [the physician] reported the incident to that body sometime later." *Id.* at 41. Accordingly, the conversations were not privileged under the Act, and the plaintiffs were entitled to a new trial on their claims against the hospital.

¶ 25   Shortly after *Roach* was decided, the appellate court applied the same principles in *Grandi v. Shah*, 261 Ill. App. 3d 551 (1994). There, a plaintiff had sued a doctor and others for medical malpractice relating to a chemotherapy injury. The trial court excluded evidence regarding conversations the hospital administrator had had with the doctor and a nurse in the course of investigating the incident on the ground that the administrator's investigation was for the purpose of improving patient care and was therefore protected under the Act. The jury found in favor of the doctor and the plaintiff appealed. The appellate court granted a new trial, finding that the evidence was not privileged and had been wrongly excluded. *Id.* at 555. The court stated:

> "Without question, the Act prohibits the disclosure of information which is 'used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care.' (Ill. Rev. Stat. 1983, ch. 110, par. 8-2101 [the predecessor to 735 ILCS 5/8-2101].) However, before the information becomes privileged under the Act, it must actually belong to a committee of a licensed or an accredited hospital or its medical staff." *Grandi*, 261 Ill. App. 3d at 556.

As there was no evidence that any hospital committee had specifically asked the administrator to investigate the incident at the time of the conversations at issue, those conversations were not privileged. *Id.* "[A]n investigation generally undertaken by hospital administration is not protected by the Act." *Id.* at 557. This is so despite the fact that the goal of the administration's investigation might be consistent with the goal of improving patient care. *Id.* ("The Act does not protect all information used for internal quality control [citation] ***.").

¶ 26    Both *Roach* and *Grandi* stand for the proposition that, even when the content of the communication is in harmony with the promotion of internal quality control and improving patient care, the communication is not privileged under the Act when it was not generated by a committee of the type described in that statute. By the same token, we must reject the defendants' argument that Dr. Shah's goals (which included ensuring that patients did not receive surgical treatment to which they had not consented) mean that the memorandum he wrote must be considered privileged under the Act.

¶ 27    The defendants argue that, even if Dr. Shah's purpose alone were not enough to render his memorandum privileged, he wrote it at the behest of two doctors who were on the MCDS board, and thus the memorandum must be considered "information of" the board, which was engaged in ongoing internal quality control. We think that the defendants somewhat overstate the facts here: Drs. Martucci and Wander testified that they advised Dr. Shah to put his concerns in writing, not that they directed him to do so. Even if they had requested (or directed) that he write the memorandum, however, that would be insufficient to bring the memorandum within the protection of the Act. There are two reasons for this.

¶ 28    The first is a matter of the chronology. As the supreme court stated plainly in *Roach*, the committee must be involved in a peer-review or quality-control process regarding the specific physician or incident at issue *before* the information is generated in order for the privilege to attach. *Roach*, 157 Ill. 2d at 40. Earlier-generated information cannot be cloaked with the privilege through the "simple act" of furnishing that information to one of the statutorily described committees. *Id.* at 41. Here, there is no evidence that, when Dr. Shah wrote the memorandum, the MCDS board, acting as a whole, had any knowledge of the specific issues raised by Dr. Shah in the memorandum, or that the board was already engaged in an investigation or review of those issues. Thus, because the memorandum was written before the board began its investigation into those issues, the memorandum cannot be regarded as having been generated as a result of the board's investigation.

¶ 29    A recent case, *Berry v. West Suburban Hospital Medical Center*, 338 Ill. App. 3d 49 (2003), is factually apposite. In *Berry*, a medical malpractice case, the plaintiff sought to compel the defendant hospital to produce a letter written to the chair of the hospital's obstetrics and gynecology department by a physician involved in the incident at issue, regarding the facts of the incident. The hospital claimed that the letter was privileged under the Act and refused to produce it. Specifically, the hospital argued that the submission of such letters or reports was the prescribed method of initiating the internal quality-control process at the hospital. The appellate court rejected this argument, finding that the letter was not privileged under the Act as a report or statement used in the course of internal quality control, because the hospital's procedure did not transform letters or reports written by

doctors into "information of" a quality-control committee as required under the Act. *Id*. at 54. "Even if the *** letter notified [the department chair, as a representative] of the investigatory committee[,] of a potential quality control issue, the Act's privilege does not apply because the *** letter was information of the Hospital's staff rather than information of any committee, peer-review or otherwise." *Id*. The court commented that the physician who wrote the letter could not successfully argue that she was acting on behalf of the department or a quality-control committee when she wrote it, because it was clear that the department was not aware of the incident until after it received her letter and it did not meet to discuss the letter until months after the letter was written. *Id*. at 56. Similarly, here there is no evidence that the MCDS board as a whole knew of Dr. Shah's concerns until after it received the memorandum, and the board's earliest consideration of the issues raised in the memorandum was at its June 2007 meeting, over a month after the memorandum was written. This later consideration of Dr. Shah's concerns cannot shield, as privileged, the act of raising those concerns in the memorandum. *Id*. at 55.

¶ 30        Dr. Shah argues that this conclusion is inconsistent with *Anderson v. Rush-Copley Medical Center, Inc.*, 385 Ill. App. 3d 167, 175 (2008), in which this court held that medical journal articles gathered as part of a peer-review process were protected by the Act "because they reflect the Committee's internal review process, including information gathering and deliberations." Dr. Shah focuses on the phrase "information gathering," and argues that such information gathering is what the board (through Drs. Martucci and Wander) was doing in asking him to write the memorandum. In making this argument, Dr. Shah misunderstands our holding in *Anderson*. We did not find the content of the articles privileged: the articles themselves were written prior to the start of the particular peer-review process at issue in *Anderson*, and thus were not themselves information generated by the committee during that process. However, the committee had asked that the articles be gathered for review, and thus the articles could be protected from disclosure because the identity of those articles and the manner in which they were used by the committee revealed the internal processes of the committee as it conducted its review and formulated its recommendations. *Id*. at 178. Thus, *Anderson* does not stand for the proposition that all "information gathering" is privileged under the Act, only that earlier-created documents may sometimes be shielded from production when identifying them would reveal the thought processes of a committee already engaged in a specific review. Here, unlike in *Anderson*, the board was not already engaged in a review of Dr. Kopolovic or his May 8, 2007, surgery when the memorandum was created, nor does the fact that the board viewed the memorandum reveal anything about the board's confidential processes. In fact, the memorandum states that it was addressed to Dr. Kopolovic in addition to the board, and thus the board's consideration of the memorandum plainly was not intended to be confidential. Accordingly, *Anderson* is inapposite.

¶ 31        The second reason that the memorandum would not be "information of" the MCDS board–even if Drs. Martucci and Wander, who are board members, had asked Dr. Shah to write it–is that the actions of individual members of a committee are not the same as the actions of that committee itself. In *Roach*, the supreme court explicitly rejected the hospital's argument that the investigation undertaken by the chair of the anesthesiology department was tantamount to an investigation by the department itself. *Roach*, 157 Ill. 2d at 42. Despite the

-10-

fact that, under the hospital's bylaws, the chair was accountable for " 'all professional and administrative activities within his department,' " it was the department itself as a whole that was charged with the responsibility for conducting medical reviews, and the bylaws did not grant the department chair the authority to act for the department outside the review process conducted at monthly meetings. *Id.* at 43.

¶ 32        Similarly, in *Pietro*, 348 Ill. App. 3d at 545, an administrator, who was a member of the facility's quality-assurance committee and was ultimately responsible for investigating all the incidents that occurred at the facility, asked three employees to prepare statements regarding the incident at issue in the lawsuit. The court found that the quality-assurance committee had not met regarding the incident before the statements were created, and "there was no evidence of a request by the committee for the information." *Id.* at 546. Thus, the statements could not be considered information generated by the committee, despite the fact that they were created at the request of a member of the committee. *Id.* at 550. Noting that "[o]ur courts have repeatedly distinguished between nonprivileged information reported to a committee and privileged information generated by *** a committee," the court held that the statements were not protected under the Act. *Id.* Here, the defendants have not submitted evidence that either Dr. Martucci or Dr. Wander was authorized by the MCDS board to investigate Dr. Shah's concerns before Dr. Shah wrote his memorandum. Accordingly, we must hold that the suggestion (or direction) by members of the MCDS board that Dr. Shah put his concerns in writing did not render the resulting memorandum privileged under the Act as a document generated by the board.

¶ 33        MCDS's final argument relating to the Act is that all of the above case law is inapplicable because it relates to the *evidentiary privilege* created by the Act rather than the type of privilege asserted by the defendants here, which is an *immunity from liability*. The Act itself does not speak in terms of granting immunity from liability. Rather, it states that information (including reports, statements, memoranda, etc.) of certain committees is "privileged, strictly confidential and shall be used only for" certain enumerated purposes, including internal quality control, medical study, and improving patient care. Thus, the explicit language of the statute creates a privilege aimed at shielding the sensitive information within the Act's scope from discovery or use at trial, *i.e.*, an evidentiary privilege. Ordinarily, where the language of a statute is unambiguous and straightforward, our analysis of the meaning of the statute begins and ends with that language. *Lee v. John Deere Insurance Co.*, 208 Ill. 2d 38, 43 (2003). We find no support in the Act's language for the proposition that the Act also creates an immunity from liability.

¶ 34        As support for its contention that the Act creates immunity from civil suits, MCDS cites *Tabora v. Gottlieb Memorial Hospital*, 279 Ill. App. 3d 108 (1996). (The defendants also cite two other cases for this proposition, *Carson v. Northwest Community Hospital*, 192 Ill. App. 3d 118 (1989), and *Rodriguez-Erdmann v. Ravenswood Hospital Medical Center*, 190 Ill. App. 3d 24 (1989), but as those cases predate both *Tabora* and the supreme court's decision in *Roach*, we find them unpersuasive.) In *Tabora*, the appellate court affirmed the trial court's dismissal of the plaintiff doctor's defamation claim on the ground that the statements made by the defendant physician about the plaintiff were privileged under the Act because they were made during the peer-review process, and therefore the statements could not serve

as the basis for a claim for civil damages. *Tabora*, 279 Ill. App. 3d at 117.

¶ 35    In assessing the support provided by *Tabora*, we note that *Tabora* did not mention the then-most-recent supreme court case on the Act (*Roach*), and no case since *Tabora* has held that the Act creates civil immunity or has cited *Tabora* for that proposition. We also note that the defendants in *Tabora* claimed civil immunity under not one but three statutes: a predecessor to the Act (Ill. Rev. Stat. 1989, ch. 110, ¶ 8-2101); the Hospital Licensing Act (now codified at 210 ILCS 85/10.2 (West 2010)); and the Medical Practice Act of 1987 (now codified at 225 ILCS 60/5 (West 2010)). The latter two statutes expressly provide for civil immunity, stating that no individual covered by the statutes shall be liable for civil damages. By contrast, as noted above, the language of the Act is directed solely toward protecting the information and documents used in peer-review and quality-control efforts.

¶ 36    Nevertheless, without deciding the correctness of the holding in *Tabora* and solely for the purpose of the argument at hand, we will assume that the Act can indeed, as *Tabora* held, make the author of statements described in the Act immune from civil liability. The question remains whether Dr. Shah qualifies as an author of statements covered by the Act. For the reasons already discussed, we find that he does not: the memorandum was not generated by a committee engaged in peer review or internal quality control, and thus it does not fall within the scope of the Act. As the memorandum itself is not within the scope of the Act, the Act does not confer immunity from civil liability on Dr. Shah or (by extension) on MCDS.

¶ 37                              Conditional Privilege

¶ 38    As we have found that the first stated basis for the trial court's grant of summary judgment, the Act, is not applicable, we turn to the second potential basis: the existence of a conditional privilege as recognized in *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16 (1993). A conditional privilege can arise in three circumstances: (1) where some interest of the person who published the defamatory statement is involved; (2) where some interest of either the recipient of the defamatory statement or a third person is involved; and (3) where a recognized interest of the public is involved. *Parker v. House O'Lite Corp.*, 324 Ill. App. 3d 1014, 1027 (2001). Once the existence of a conditional privilege has been established, a statement is actionable only if the plaintiff can show that the defendant abused the privilege. *Id*. at 1029. A plaintiff can meet this burden by showing that the defendant acted recklessly by failing to: properly investigate whether the statement was true, limit the scope of the statement, or limit the publication of the statement to the proper parties. *Id*.

¶ 39    Here, the trial court found that the memorandum was conditionally privileged. Dr. Kopolovic argues that the trial court erred in granting summary judgment for the defendants on this basis, because he presented evidence showing that Dr. Shah abused the privilege and the evidence at the very least raises a question of fact about whether the privilege applies. Specifically, Dr. Kopolovic argues that Dr. Shah failed to properly investigate the truth of the statements he made in the memorandum and did not properly limit its scope.

¶ 40    "The issue of whether a privilege was abused ordinarily is a question of fact." *Id*. Viewing the facts here in the light most favorable to the nonmovant, as we must (*Adams*, 211 Ill. 2d at 43), we find that Dr. Kopolovic's evidence raises a question of fact regarding

-12-

whether Dr. Shah properly investigated the truth of the statements he made in the memorandum before publishing those statements. For instance, Dr. Shah asserted that the patient in question had "minimal or no umbilical hernia," but he admitted in his deposition that he had not reviewed the patient's medical records prior to writing the memorandum. Indeed, this assertion was undermined by Dr. Shah's own expert witness, who stated that he did not question Dr. Kopolovic's diagnosis of an umbilical hernia requiring surgical repair. Dr. Shah also stated that Dr. Kopolovic performed an abdominoplasty on the patient rather than an umbilical hernia repair, but Dr. Shah was an anesthesiologist rather than a surgeon, and there is no evidence that he consulted with a surgeon regarding the type of surgery performed before writing his memorandum. Similarly, Dr. Shah made statements in the memorandum about how the surgery was billed, but he admitted that he did not look at any billing records prior to writing the memorandum. Dr. Shah also did not voice his concerns directly to Dr. Kopolovic prior to writing the memorandum. Dr. Shah argues that he was not legally obliged to take any of these steps. However, while it is true that no one method of investigation will fit all possible cases, the law requires that someone who publishes statements about another may not act with reckless disregard for the other's rights. *Kuwik*, 156 Ill. 2d at 30. This in turn requires that the author of the statements must make some effort beforehand to investigate the truth of those statements, and if he does not he may be found to have abused the conditional privilege. *Id*.

¶ 41    Dr. Shah argues that, even if he had reviewed the billing records and the patient's medical records, they would have supported his conclusions. Dr. Kopolovic, of course, argues to the contrary. Regardless of the correctness of this assertion, however, after-the-fact justification is not a legally recognized substitute for conducting a proper investigation of the truth of statements prior to making them, and it does not rebut the argument that Dr. Shah was acting recklessly when he wrote the memorandum. To do that, Dr. Shah would have to point to steps that he took to investigate ahead of time. The only such steps Dr. Shah identifies are his actions in voicing his concerns to Drs. Griesemer, Martucci, and Wander. However, voicing one's concerns is not the same thing as investigating. Viewing all of the evidence submitted in conjunction with the motions for summary judgment, we conclude that Dr. Kopolovic has raised a genuine issue of fact regarding whether Dr. Shah abused the conditional privilege. Accordingly, summary judgment is not appropriate here on the basis of conditional privilege.

¶ 42                                    Substantial Truth

¶ 43    The last basis for the trial court's grant of summary judgment for the defendants was its determination that the statements in the memorandum were substantially true. "An allegedly defamatory statement is not actionable if it is substantially true, even though it is not technically accurate in every detail." *Parker*, 324 Ill. App. 3d at 1026 (citing *Cianci v. Pettibone Corp.*, 298 Ill. App. 3d 419, 424 (1998)). The defendant seeking to raise this defense has the burden of establishing that the statements were substantially true, that is, "that the 'gist' or 'sting' of the defamatory material is true." *Id*. A court considering the issue of substantial truth must focus on the heart or "highlight" of the allegedly defamatory material, not on minor details or items of secondary importance. *Id*.; see also *Gist v. Macon*

*County Sheriff's Department*, 284 Ill. App. 3d 367, 370 (1996). The determination of whether the allegedly defamatory material was substantially true is normally a jury question, but summary judgment may be entered where any reasonable jury would have to find that the substantial truth of the material had been established. *Id.*

¶ 44 Before we begin with our analysis of substantial truth, we note that the trial court erred in stating that courts must apply the "innocent construction" rule in assessing the substantial truth of a publication. The innocent construction rule is a tool used in determining whether the complained-of material is defamatory *per se* (*J. Maki Construction Co. v. Chicago Regional Council of Carpenters*, 379 Ill. App. 3d 189, 203 (2008)), that is, whether the material is so obviously and seriously injurious to the plaintiff's reputation that damages will be presumed without the need to plead and prove special damages (*id.* at 199). This question of whether material is defamatory *per se* (a question not raised in the defendants' motions for summary judgment) is wholly separate from the defense of substantial truth, and thus the innocent construction rule is not applied when the issue is the substantial truth of the material. See *id.* at 204 (having found that the complained-of material was substantially true, the court need not consider the defendants' innocent construction arguments). Thus, the trial court should not have applied the innocent construction rule to the question of whether the memorandum was substantially true. However, because our review is *de novo*, we need not be concerned with the trial court's legal error. Instead, we simply consider the parties' arguments without reference to that aspect of the trial court's ruling.

¶ 45 In considering whether the memorandum was substantially true, we find that it contains several potentially defamatory components. We examine each of these separately to determine whether the particular accusation or charge is substantially true.

¶ 46 *The charge that the patient had "minimal or no umbilical hernia."* There is no real dispute that, according to the medical records, the patient had an umbilical hernia, and thus the portion of this statement asserting that the patient had "no" hernia is not true. We therefore consider whether the statement that the hernia was "minimal" was substantially true. We view the "sting" of this "minimal" description as the implication that Dr. Kopolovic did not need to create the large incision that he in fact used to gain access to the hernia. The parties dispute this point fiercely. Dr. Kopolovic, citing the testimony of himself and his expert witness, notes that the patient had had a previous surgery for an umbilical hernia repair and had other surgical scars on her abdomen, and he states that the transverse incision below her Caesarian section scar was the most appropriate approach given these facts. Dr. Shah, supported by his expert witness, disagrees, arguing that the umbilical hernia itself was small enough that Dr. Kopolovic did not need to use mesh to repair it and that Dr. Kopolovic could have made a direct approach to the hernia if he had wished. We find that Dr. Kopolovic has presented sufficient evidence to create a genuine question of fact on the issue of whether the charge that the hernia was minimal was substantially true, and that the defendants therefore are not entitled to summary judgment regarding this charge.

¶ 47 *The charge that Dr. Kopolovic performed a full abdominoplasty.* Again, there is substantial disagreement between the parties regarding this charge and evidence supporting both positions. Dr. Shah points to the fact that Dr. Kopolovic removed a substantial amount of skin and fat from the patient's abdomen (Dr. Shah's expert witness estimated that it was

-14-

as much as 200 to 300 square centimeters of skin; according to Dr. Kopolovic, it was far less), and notes the general similarities between this and an abdominoplasty. However, Dr. Shah's own expert witness stated unequivocally that Dr. Kopolovic did not perform a "full abdominoplasty," which would include plication of the musculature as well as the removal of fat and skin. Thus, the substantial truth of this charge has not been established.

¶ 48    *The charge that Dr. Kopolovic performed surgery that was not on the consent form*. This charge was not stated directly, but it was a clear implication of several of Dr. Shah's other statements: (1) the patient was scheduled for liposuction, blepharoplasty, and umbilical hernia repair; (2) Dr. Kopolovic performed a "full abdominoplasty" on her, a procedure not scheduled; and (3) "it is unethical to perform a surgery which is not on the consent or on the schedule."[2] (In addition, all of the parties agree that performing a surgery not on the consent form was one "gist" of Dr. Shah's statements in the memorandum.) As discussed above, Dr. Shah has not established the substantial truth of the second of these statements, that Dr. Kopolovic performed a full abdominoplasty. Accordingly, he cannot establish the substantial truth of the charge that Dr. Kopolovic performed a full abdominoplasty that was not on the consent form.

¶ 49    The defendants argue that the memorandum was really saying only that Dr. Kopolovic performed a surgical procedure that was not on the consent form, and that it is undisputed that he did so: in the post-operative report, Dr. Kopolovic stated that he performed the three procedures that were on the consent form, and also one other procedure that was not on the consent form–the "excision of multiple abdominal scars and repair and revision." There are two difficulties with this argument. First, the only unauthorized procedure that the memorandum identified was the abdominoplasty. A reader of the memorandum would have no reason to think that Dr. Shah was really charging that Dr. Kopolovic excised the patient's abdominal scars without her consent. We think the "sting" of this charge is therefore inescapably related to the charge that Dr. Kopolovic performed an abdominoplasty. Second, both Dr. Kopolovic and his expert witness have stated that the excision of scars and removal of excess fat and skin that Dr. Kopolovic performed were an ordinary part of closing the surgical incision and thus did not need to be stated separately on the surgical consent form. This point is disputed. Taking all of the evidence on this charge together, and viewing it in the light most favorable to the nonmovant as we must (*Adams*, 211 Ill. 2d at 43), we find that Dr. Kopolovic has raised a factual question regarding the substantial truth of this charge.

¶ 50    *The charge that Dr. Kopolovic's actions were an improper effort to relieve the patient of the cost for a cosmetic procedure, thereby cheating Dr. Shah and MCDS (and, presumably, the patient's insurance carrier) of proper compensation*. Again, this charge was not directly stated, but arises from reading together certain of Dr. Shah's statements, namely, that Dr. Kopolovic "disguised" an abdominoplasty as an umbilical hernia repair and that,

---

[2]For the purposes of determining substantial truth, we leave aside Dr. Shah's descriptions of Dr. Kopolovic's actions (including allegedly performing an unconsented-to surgery) as "unethical" and "deceptive," and instead focus on the factual assertions contained in the memorandum.

because of this, the patient did not pay the anesthesiologist and MCDS in advance the full costs of the abdominal surgery, which was instead billed to insurance. The substantial truth of this charge cannot be established when there is a factual question as to whether the surgery performed should be more correctly described as a hernia repair or as a tummy tuck, *i.e.*, cosmetic surgery. There was evidence that at least some portion of the abdominal surgery was not purely cosmetic, in that there was a medical reason (an umbilical hernia that was undisputedly symptomatic) for it. Beyond that, the parties dispute the correct characterization of the surgery. On this record, we must find that there is a factual question about whether this charge is substantially true.

¶ 51    In summary, we find that there are factual questions regarding the substantial truth of all of the primary charges or defamatory matters contained in the memorandum, and thus the defendants are not entitled to summary judgment on the basis that the memorandum was substantially true. Nor is summary judgment proper on any of the other grounds given by the trial court in its ruling. However, the defendants assert that the trial court's judgment may nevertheless be upheld on other grounds. We therefore examine the defendants' arguments.

¶ 52                                    Remaining Arguments

¶ 53    MCDS offers one more argument regarding the defamation claim: it argues that the statements in the memorandum were merely opinions, not factual assertions, and that therefore they are constitutionally protected and are not actionable. (Interestingly, Dr. Shah himself has not asserted that his statements in the memorandum were merely opinions.) The trial court did not reach this argument and we decline to consider it. *Weedon v. Pfizer, Inc.*, 332 Ill. App. 3d 17, 31 (2002). Even if we were inclined to consider the argument, we would not do so here, as its presentation is brief in the extreme. MCDS does not list, let alone discuss, the factors identified by our supreme court as relevant in determining whether a statement is an opinion or a factual assertion, which include among other things whether the statement has a precise and readily understood meaning and whether the statement is verifiable. *J. Maki Construction*, 379 Ill. App. 3d at 200. Nor does MCDS cite cases that are factually similar. Rather, to support its argument it simply refers generally to (1) Dr. Shah's deposition testimony, in which he stated that the issues raised in his memorandum involved "matters of medical opinion," and (2) the deposition testimony of Dr. Kopolovic's expert, which MCDS describes as "replete with *** medical opinions about those very same issues." These references are insufficient to raise a legal argument. We accordingly decline to address the issue of opinion. Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006); *Mikolajczyk v. Ford Motor Co.*, 374 Ill. App. 3d 646, 677 (2007).

¶ 54    The defendants raise no other basis for sustaining the trial court's grant of summary judgment on count I, the defamation claim. We therefore reverse that grant. The trial court also granted summary judgment on count II, the claim for false light invasion of privacy, because where the allegedly defamatory statements also form the basis for the invasion of privacy claim, the failure of the defamation claim requires that the invasion of privacy claim must also fail. *Seith v. Chicago Sun-Times, Inc.*, 371 Ill. App. 3d 124, 139 (2007). As we have reversed the trial court's grant of summary judgment on the defamation claim, we

likewise reverse its grant of summary judgment as to the invasion of privacy claim.

¶ 55    The second amended complaint also contained claims against MCDS, for negligence and vicarious liability. The trial court did not rule on MCDS's arguments that Dr. Kopolovic could not prove duty, breach, and resulting damages, and that Dr. Shah was not its employee and therefore it was not vicariously liable for his actions. Rather, the trial court granted summary judgment for MCDS on both of these claims on the basis of its findings that the memorandum was privileged and was substantially true, holding that therefore as a matter of law MCDS could not have been negligent in failing to investigate the memorandum and there was no defamation by Dr. Shah for which MCDS could be vicariously liable. In its brief on appeal, MCDS asks us to reach these issues that the trial court did not, sustaining the grant of summary judgment on these alternate grounds. We again decline to rule on issues not reached by the trial court (*Weedon*, 332 Ill. App. 3d at 31) and instead remand for further proceedings, during which MCDS is free to raise these arguments for determination by the trial court.

¶ 56    The final matter to be addressed is Dr. Kopolovic's request that we review the trial court's denial of leave to amend his complaint. In his reply brief, Dr. Kopolovic states that he sought leave to plead a claim of defamation *per quod* only because he understood the trial court's mention of the innocent construction rule as implying that there was some question as to whether the memorandum fell within the category of defamation *per se*. However, as we have noted (and as the parties appear to agree), the trial court's mention of this rule was simply a misstatement made in the process of ruling on the substantial truth defense raised by the defendants. Accepting that there was no true challenge to the *per se* nature of his defamation claim, Dr. Kopolovic therefore withdraws from our consideration the issue of his request for leave to amend.

¶ 57                                    CONCLUSION

¶ 58    For all of the foregoing reasons, we reverse the judgment of the circuit court of Du Page County and remand for further proceedings consistent with this opinion.

¶ 59    Reversed and remanded.