# Illinois Official Reports

## Appellate Court

---

**Nielson v. SwedishAmerican Hospital, 2017 IL App (2d) 160743**

---

| | |
|---|---|
| Appellate Court Caption | CONNIE F. NIELSON and DAVID A. NIELSON, Plaintiffs-Appellees, v. SWEDISHAMERICAN HOSPITAL and AMANDA J. BUSH, Defendants (SwedishAmerican Hospital, Defendant-Appellant). |
| District & No. | Second District<br>Docket No. 2-16-0743 |
| Filed<br>Rehearing denied | June 23, 2017<br>July 25, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Winnebago County, No. 15-L-30; the Hon. Eugene G. Doherty, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part. |
| Counsel on Appeal | David P. Faulkner and Michael J. Orsi, of Faulkner Gustafson, LLC, of Rockford, and Hugh C. Griffin, of Hall, Prangle & Schoonveld, LLC, of Chicago, for appellant.<br><br>Gregory E. Barrett and Jenna Lew Ewing, of Barrett Law Firm, P.C., of Rockford, for appellees. |

Panel                      JUSTICE JORGENSEN delivered the judgment of the court, with opinion.

Justices Burke and Schostok concurred in the judgment and opinion.

## OPINION

¶ 1      In this interlocutory appeal, defendant, SwedishAmerican Hospital, challenges the trial court's order, finding it in contempt for refusing to produce three quality control reports (QCRs) pertaining to surgery performed on plaintiff Connie F. Nielson. See Ill. S. Ct. R. 304(b)(5) (eff. Mar. 8, 2016) (order finding entity in contempt and imposing monetary penalty is appealable without special finding). Defendant argues that the QCRs are privileged under sections 8-2101 and 8-2102 of the Code of Civil Procedure (735 ILCS 5/8-2101, 8-2102 (West 2014)) (Medical Studies Act or Act) because they were submitted to a quality-assurance committee by the committee's designees, pursuant to the committee's standing request for such information whenever a defined "medical occurrence" has taken place. We affirm in part and vacate in part.

¶ 2                        I. BACKGROUND

¶ 3                        A. Surgeries

¶ 4      On December 17, 2013, Connie underwent scheduled outpatient surgery at defendant's hospital in Belvidere to remove a vaginal cyst. During the surgery, which was performed by codefendant, Dr. Amanda J. Bush, a board-certified gynecologist and employee of defendant, Connie's bladder was injured. Connie was transported on an emergency basis to defendant's hospital in Rockford for surgical repair of her bladder.

¶ 5                        B. QCRs

¶ 6      Three nurses involved in either Connie's original or second surgery each prepared a QCR between December 17 and 20, 2013.

¶ 7      Beverly Merfeld, defendant's director of risk management, averred as follows. She is a member of the committee for quality improvement and safety (CQI), the board quality and safety leadership committee, and the medical-staff quality and safety committee (QA/I). Merfeld reports directly to the chief medical officer and vice president of quality services, who is also a member of the QA/I.

¶ 8      According to Merfeld, defendant's medical-staff bylaws establish various quality-assurance committees and subcommittees to conduct peer-review and quality-improvement activities. The CQI and QA/I and their subcommittees were established to reduce morbidity and mortality and to improve patient care. The activities of the quality-assurance committees and their subcommittees, as well as those of their designees, are treated confidentially.

¶ 9      The QA/I has requested that information on "medical occurrences" be collected on its behalf in the form of QCRs. The QA/I developed the QCR template in 1999 in an effort to comply with the Act, and it identified the occurrences for which it was proactively seeking

information. QCRs are gathered at the direction and (standing) request of the QA/I and are forwarded to Merfeld in her capacity as a member of the CQI and QA/I.

¶ 10    Merfeld received the three QCRs concerning Connie's surgeries, and she reviewed them pursuant to defendant's "quality structure" via the quality-resource department (QRD), a designee of the QA/I that collects data for analysis by the QA/I's subcommittees. On January 24, 2014, the women's health quality and safety subcommittee of the QA/I (WHQS) reviewed the care at issue and reported its findings to the QA/I and the CQI. Merfeld averred that, as a result of the peer-review process concerning Connie's treatment, there were no actions taken regarding any physician privileges and no changes in defendant's policy, procedure, rules, or regulations.

¶ 11    In their affidavits, the nurses averred that they completed the QCRs at the request of the QA/I and forwarded the documents to Merfeld "in the Risk Management Department." They understood that the information would be kept confidential and was of the type that the QA/I was requesting for peer-review and quality-improvement purposes.

¶ 12    The QCR form provides as follows: "The QA/I Committee of the Medical Staff has determined that the 'Medical Occurrence' can affect patient morbidity and mortality; hence, the Committee requests that information be gathered for it and on its behalf in these instances. Such information is a quality-improvement tool and is confidential under the Illinois Medical Studies Act." As to nonmedical occurrences, the form provides that "[t]hese categories pertain to non-medical matters." The form contains checklists under the headings of medical and nonmedical occurrences. The list of medical occurrences includes the following: admission R/T output rx; behavioral, blood transfusion; code during treatment; complaint; discharge planning; equipment use related; fall/found on floor; infection; injury; lab test; medical record; medication; policy/procedure/practice; quality of services; and other. Nonmedical occurrences include property loss/damage, slip and fall/nonpatient, legal action, vehicular accident, and injury/nonpatient. The person completing the form is instructed to consult the reverse side of the form, which contains definitions of the various terms. The term "legal action" is defined for *both* medical and nonmedical occurrences, even though it appears on only the list of nonmedical occurrences on the front of the form. "Legal action" is defined for medical occurrences as: "Any activities involving formal legal activities; such as subpoena for records or staff, lawsuits filed against the health system, employees, or medical staff which pertain to medical care issues." The term is defined in a substantially similar fashion for nonmedical occurrences: "Any activities involving formal legal activities by non-patients; such as subpoena for staff or employees, lawsuits filed against the Health System, its employees, medical staff, or the Hospital."

¶ 13    The form contains an area to describe the circumstance at issue, and it instructs the person completing the form to "Send to Risk Manager* or Administrator of SIR (Non-Medical)," with the risk manager described as being a member of the CQI and the QA/I.

¶ 14    C. Medical-Staff Quality-Improvement Plan and Medical-Staff Bylaws

¶ 15    Defendant's medical-staff quality-improvement plan for fiscal year 2013 provides that the medical staff and the board of directors direct the QRD to gather the information "that is used to evaluate patient morbidity and mortality." "Medical Staff Quality and Safety Subcommittees are responsible for the timely assessment of the data and evaluation and disposition of cases identified for peer review."

¶ 16        Defendant's medical-staff bylaws, dated November 2013, provide for various committees, including the QA/I. Section 12.6.b states, in relevant part:

>        "The membership of this Committee shall include the Chair of each clinical Department's Quality and Safety Subcommittee or their designees; a Chair to be selected by the President of the Medical Staff; and such other members as may be provided for in the Hospital's Quality and Safety Plan for Improving Organizational Performance.
>
>        The members shall monitor and evaluate objectively and systematically the quality, safety, and appropriateness of patient care provided by members of the Medical Staff. They *** shall receive and evaluate reports from individual quality and safety subcommittees and provide a forum for interdepartmental discussions. ***
>
>        Quality and Safety Committee meetings shall be scheduled at least bi-monthly; written records of its proceedings and activities shall be recorded and maintained by members of the Quality Resource Department; reported to the Medical Executive Committee on a routine basis, and reported to the Credentials Committee as necessary."

¶ 17                            D. Policy-and-Procedure Manual

¶ 18        Defendant's policy-and-procedure manual contains a section concerning incident reporting. The document states that QCRs "will be used to communicate occurrences or variances affecting patients, physicians, visitors, volunteers, students, employee property, and [defendant's] property" and that the "information will be used to monitor, evaluate, and improve the quality and safety of services" that defendant provides. A QCR must be completed for each occurrence, variance, serious event, near miss, or sentinel event. The policy provides that any "employee, student, volunteer, visitor, or physician involved in, observing, or discovering an occurrence," etc., must complete a QCR and submit it to his or her supervisor (if applicable) prior to the end of his or her shift.

¶ 19        The manual further provides that a "reportable occurrence or variance is any event which is not consistent with quality health care or normal operations, reflects recurring concerns or problems, *or indicates the potential for a claim or lawsuit*." (Emphasis added.) Where it is determined that an unanticipated outcome was preventable, the patient will not be billed for the costs associated with treatment related to the event, and the chief medical officer, the chief quality officer, and/or the chief financial officer will determine whether a bill write-off or payment is necessary. The manual further states that responsibility for certain costs "can only be determined after investigation of the occurrence by Risk Management or their designee." The manual also states that completed QCRs "should be sent to Risk Management as soon as possible to facilitate follow-up, investigation, resolution, and data collection." In the case of a sentinel event, for example, the chief medical officer or the chief quality officer "or his designee will determine if a *** team should be convened to conduct an investigation." The manual advises that QCRs are not to be made part of a patient's medical records or an employee's personnel file and that the responsibility for medical costs or lost or damaged items will be determined only after the risk-management department or its designee investigates the occurrence.

¶ 20        The manual further states that QCR forms are "a significant component of" defendant's quality-improvement program and that disclosure of the information in the forms, other than

for quality review, is prohibited under the Act. However, the manual also states that the risk-management department "reviews all QCRs and conducts investigation of occurrences or variances which require more complete documentation, *follow-up from a risk management perspective,* or reporting under the Safe Medical Devices Act." Also, it provides that a "QCR may serve as a report to legal counsel to assist in the defense of a lawsuit or claim."

E. Lawsuit and Trial Court Order

On January 29, 2015, Connie and plaintiff David A. Nielson sued defendant and codefendant, alleging negligence and seeking to recover damages for Connie's bladder injury. Plaintiffs subsequently sought to compel defendant to produce the three QCRs. Defendant refused, arguing that the documents were protected from discovery by the Medical Studies Act. Defendant submitted the QCRs to the court for *in camera* review.

On May 31, 2016, the trial court granted plaintiffs' motion to compel. It initially noted that, pursuant to the statutory language, the QCRs appeared to constitute information of one of defendant's quality-assurance committees. However, it continued, the case law compelled a finding that the documents were not protected by the Act.

Just prior to this ruling, plaintiffs moved to file supplemental briefs based on information in defendant's recently discovered policy-and-procedure manual on incident reporting (described above). After the hearing, the court determined that in light of the supplemental briefing, it did not "see a reason to depart from [its] decision." On August 18, 2016, the trial court found that defendant had refused to comply with its order to produce the QCRs and that, accordingly, defendant was in civil contempt. The court fined defendant $1 per day until the QCRs were produced. Defendant appeals.

II. ANALYSIS

Defendant argues that the trial court erred in ordering it to produce the QCRs. It contends that they are privileged from discovery under the Act's express statutory language and that such a determination is consistent with the Act's purpose (as stated in *Anderson v. Rush-Copley Medical Center, Inc.*, 385 Ill. App. 3d 167 (2008)). Defendant asserts that no case compels denial of the privilege and that the most factually analogous case, *Ardisana v. Northwest Community Hospital, Inc.*, 342 Ill. App. 3d 741 (2003), supports application of the privilege. It urges us to distinguish *Berry v. West Suburban Hospital Medical Center*, 338 Ill. App. 3d 49 (2003), and *Kopolovic v. Shah*, 2012 IL App (2d) 110383, upon which the trial court relied, or to disregard *Kopolovic* because it did not consider a recent amendment to the statute, as noted in *Eid v. Loyola University Medical Center*, 2017 IL App (1st) 143967. Defendant asserts that the QA/I as a whole proactively determined to undertake a quality review of any outpatient complication resulting in a hospital admission and that, as the committee's "designees," the medical personnel involved in such an occurrence are to commence that review process by completing and submitting QCRs. Thus, in its view, the QCRs are information initiated by a peer-review or quality-assurance committee and they fulfilled their intended purpose here by initiating a quality-assurance process that culminated with no action being taken regarding any physician's privileges and no changes in defendant's policies or procedures. For the following reasons, we hold that the trial court's factual findings were against the manifest weight of the evidence, but we agree that the documents are not privileged.

¶ 27                                    A. Standards of Review

¶ 28        The question of whether the Act's privilege applies is a question of law, which is reviewed *de novo*; however, the question of whether specific materials are part of an internal quality-control process "is a factual question," on which the defendant bears the burden. *Berry*, 338 Ill. App. 3d at 53-54. The trial court's factual determination will not be reversed, "unless it is against the manifest weight of the evidence." *Id.* at 54. A decision is against the manifest weight of the evidence if it is unreasonable, arbitrary, or not based upon the evidence. *Freese v. Buoy*, 217 Ill. App. 3d 234, 244 (1991).

¶ 29        Defendant argues that we need reach only the legal issue here, not any factual ones. It notes that the trial court determined only that *Kopolovic* and *Berry* compelled it to rule as it did as a matter of law. Furthermore, defendant notes that this court's most recent Medical Studies Act decision, *Lindsey v. Butterfield Health Care II, Inc.*, 2017 IL App (2d) 160042, ¶ 10, used only the *de novo* standard.

¶ 30        We disagree that only the legal issue is before us. Whether the QCRs are part of defendant's quality-assurance process is clearly a factual determination. It is true that the trial court focused its analysis on the case law, but it also made that factual determination concerning defendant's quality-assurance process, and it did so in light of defendant's policy-and-procedure manual, which presents factual issues concerning the QCRs' purpose and role in the process. Accordingly, we address both the factual and legal issues.

¶ 31                                        B. Privilege
¶ 32                                        1. Background
¶ 33        Section 8-2101 of the Act provides, in relevant part:

> "*All information*, interviews, reports, statements, memoranda, recommendations, letters of reference or other third party confidential assessments of a health care practitioner's professional competence, *or other data of \*\*\* committees of licensed or accredited hospitals or their medical staffs*, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees and Executive Committees, *or their designees* (but not the medical records pertaining to the patient), *used in the course of internal quality control* or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, *shall be privileged*, strictly confidential and shall be used only for medical research, increasing organ and tissue donation, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges or agreements for services \*\*\*." (Emphases added.) 735 ILCS 5/8-2101 (West 2014).

Section 8-2101 was amended in 1995 to add "or their designees" after the description of the committees, a change that not all recent cases acknowledge. Pub. Act 89-393 (eff. Aug. 20, 1995).

¶ 34        The Act further provides:

> "Such information, records, reports, statements, notes, memoranda, or other data, shall not be admissible as evidence, nor discoverable in any action of any kind in any court or before any tribunal, board, agency or person. The disclosure of any such information or data, whether proper, or improper, shall not waive or have any effect upon its

confidentiality, nondiscoverability, or nonadmissibility." 735 ILCS 5/8-2102 (West 2014).

¶ 35    The Act's purpose "is [neither] to facilitate the prosecution of malpractice cases" (*Jenkins v. Wu*, 102 Ill. 2d 468, 479 (1984)) nor to shield hospitals from potential liability (*Roach v. Springfield Clinic*, 157 Ill. 2d 29, 42 (1993)). Rather, it "is to ensure that members of the medical profession will effectively engage in self-evaluation of their peers in the interest of advancing the quality of health care." *Id.* at 40. The statute "is premised on the belief that, absent the statutory peer-review privilege, physicians would be reluctant to sit on peer-review committees and engage in frank evaluations of their colleagues." *Jenkins*, 102 Ill. 2d at 480. The Act also serves "to encourage candid and voluntary studies and programs used to improve hospital conditions and patient care or to reduce the rates of death and disease." *Niven v. Siqueira*, 109 Ill. 2d 357, 366 (1985).

> "The Act does not protect 'all information used for internal quality control' (*Grandi v. Shah*, 261 Ill. App. 3d 551, 557 (1994)); instead, documents 'generated specifically for the use of a peer-review committee receive protection under the Act' (*Chicago Trust Co.* [*v. Cook County Hospital*, 298 Ill. App. 3d 396, 402 (1998)]). A document that 'was initiated, created, prepared, or generated by a peer-review committee' is privileged under the Act, 'even though it was later disseminated outside the peer-review process.' *Chicago Trust Co.*, 298 Ill. App. 3d at 406. The reverse is not true, however. A document created 'in the ordinary course of the hospital's medical business or for the purpose of rendering legal opinions or to weigh potential liability risk or for later corrective action by the hospital staff' is not privileged 'even though it later was used by a committee in the peer-review process.' *Chicago Trust Co.*, 298 Ill. App. 3d at 406." *Webb v. Mount Sinai Hospital & Medical Center of Chicago, Inc.*, 347 Ill. App. 3d 817, 825 (2004).

¶ 36    The privilege does not apply to all information used for internal quality control or peer review, but only to the "information of" such committees. *Roach*, 157 Ill. 2d at 39; see also *Kopolovic*, 2012 IL App (2d) 110383, ¶ 19. " 'Information of' has a specific meaning here: it encompasses only information 'initiated, created, prepared or generated by' a peer-review or quality-control committee." *Kopolovic*, 2012 IL App (2d) 110383, ¶ 19 (quoting *Pietro v. Marriott Senior Living Services, Inc.*, 348 Ill. App. 3d 541, 549 (2004)).

¶ 37    The Act's protection does not extend to information generated either "before a peer-review process begins or after it ends." *Ardisana*, 342 Ill. App. 3d at 748; see also *Kopolovic*, 2012 IL App (2d) 110383, ¶ 19 (information that is generated before the relevant committee's decision to review an incident is not privileged); *Webb*, 347 Ill. App. 3d at 825 ("the hospital committee 'must be engaged in the peer-review process before the statutory privilege is applicable' " (quoting *Grandi*, 261 Ill. App. 3d at 557)).

¶ 38    The cases also distinguish between recommendations and results of peer-review committees. They hold that the statute protects "documents that arise from the workings of a peer-review committee [citation] and that are an integral part but not the result of the peer-review process." *Ardisana*, 342 Ill. App. 3d at 746-47. "The recommendations and internal conclusions of peer-review committees, which may or may not lead to [certain]

results, *are not discoverable*." (Emphasis in original.) *Id.* at 747. *Results* of the peer-review process are *not* privileged and are discoverable. *Id.*[1]

¶ 39    The assertion of a privilege under the Act may be supported either by submitting the purportedly privileged materials for *in camera* inspection, which was done here, or by submitting affidavits setting forth facts sufficient to establish the application of the privilege to the materials, which was also done here. *Id.* at 748. When the facts in an affidavit are uncontradicted, "they must be taken as true notwithstanding the existence of contrary unsupported allegations." *Flannery v. Lin*, 176 Ill. App. 3d 652, 658 (1988). However, a counteraffidavit is not the only means by which an affidavit can be contradicted; an affidavit can be contradicted by other documentary evidence. See, *e.g.*, *Rumford v. Countrywide Funding Corp.*, 287 Ill. App. 3d 330, 336 (1997).

¶ 40                    2. The QCRs and the Statutory Language

¶ 41    The statutory language appears, at first blush, to cover the QCRs because *at least part of their purpose* is to facilitate peer-review and quality-assurance activities. The statute provides that the privilege applies to all of the information, reports, etc., excluding patient medical records, of hospital- or medical-staff committees *or their designees* that are "used" in the course of internal quality control or for improving patient care. 735 ILCS 5/8-2101 (West 2014). Defendant's medical-staff bylaws provide for a quality and safety committee, subcommittees, and their designees to "monitor and evaluate" the "quality, safety, and appropriateness of patient care." Similarly, the quality-improvement plan states that the quality and safety subcommittees "are responsible for the timely assessment of the data and evaluation and disposition of cases identified for peer review." The policy-and-procedure manual states that a QCR must be completed for each medical occurrence and will be used to monitor, evaluate, and improve quality and safety. Indeed, Merfeld, defendant's director of risk management, averred that the QA/I developed the QCR template in an effort to comply with the Act and identified medical occurrences for which the committee would be proactively seeking information. The QCRs here were forwarded to Merfeld in her capacity as a member of the CQI and the QA/I. She reviewed them pursuant to defendant's quality structure and, on January 24, 2014, the WHQS reviewed plaintiff's case and reported its findings to the QA/I and CQI. The process was kept confidential.

¶ 42    However, Merfeld's affidavit and other documentary evidence also reflected that QCRs are generated for all medical occurrences, are used for *both* quality-assurance and risk-management purposes, and are reviewed by the risk-management department to, among other things, assess whether further actions should be taken "from a risk management perspective." Further, all QCR forms state that they are used to compile information concerning both medical and nonmedical occurrences. The list of nonmedical occurrences on the front of the form does not include "legal action," but the reverse side of the form, which contains the definitions of listed items, includes that term on the nonmedical occurrences list;

---

[1]"*Results* of a peer-review committee take the form of ultimate decisions made or actions taken by that committee, or the hospital, and include the revocation, modification or restriction of privileges, letters of resignation or withdrawal, and the revision of rules, regulations, policies and procedures for medical staff." (Emphasis in original.) *Id.*

thus, potential legal implications of a medical occurrence can be flagged on the form. (In this case, there is no such notation on any of the three QCRs.)

¶ 43 Defendant's policy-and-procedure manual elaborates, in a section concerning incident reporting, that QCRs are used to improve quality and safety and are "a significant component of" defendant's quality program. Any "employee, student, volunteer, visitor, or physician involved in, observing, or discovering an occurrence" must complete a QCR and submit it to his or her supervisor (if applicable) prior to the end of his or her shift. A reportable occurrence is defined as an event that "is not consistent with quality health care or normal operations, reflects recurring concerns or problems, *or indicates the potential for a claim or lawsuit*." (Emphasis added.) The policy manual further provides that the risk-management department reviews all QCRs and investigates occurrences requiring follow-up from a risk-management perspective and that QCRs "*may* serve as a report to legal counsel to assist in the defense of a lawsuit or claim." (Emphasis added.) The manual instructs that completed QCRs "be sent to Risk Management as soon as possible to facilitate follow-up, investigation, resolution, and data collection." They are not made part of a patient's medical record or an employee's personnel file. The forms also address billing, instructing that responsibility for medical costs is determined after the risk-management department or its designee investigates the occurrence.

¶ 44 The foregoing evidence reflects that the QCRs here (indeed all of defendant's medical-occurrence QCRs) serve multiple purposes, including quality assurance (all medical-occurrence QCRs), risk management (all QCRs), and, to a certain extent, billing (all QCRs). The trial court's finding that defendant's QCRs are generated solely at the quality-assurance committees' and subcommittees' direction pursuant to a standing order and used solely for quality-assurance purposes was against the manifest weight of the evidence. It is unclear to us if even the primary purpose of the QCRs here (and all medical-occurrence QCRs) is for quality assurance. Nevertheless, *all* medical- and nonmedical-occurrence QCRs are reviewed by defendant's risk-management department to determine whether there should be follow-up from a risk-management perspective.

¶ 45 Defendant maintains that there is no contradiction between Merfeld's affidavit and the policy-and-procedure manual. The instruction that QCRs should be sent to the risk-management department for review and potential follow-up, it argues, merely echoes Merfeld's statement that QCRs are sent to her (she is the risk management director) and she then facilitates appropriate follow-up through defendant's quality structure. Defendant also contends that, even if Merfeld was not also a member of the QA/I and the CQI, she clearly acted as their designee in receiving the QCRs and facilitating submission of the information therein to the WHQS as part of the peer-review process. Defendant argues that, to the extent that the policy manual can be read to permit Merfeld to take action concerning a medical occurrence "from a risk management perspective," the QCRs would still be privileged under the Act because a document that is privileged does not lose such status once it is disseminated outside of the peer-review process. We find this argument unpersuasive because the policy manual does not state, for example, that QCRs are reviewed in a series of steps, the first of which is for quality assurance and the second of which is for risk management. We cannot clearly discern from the manual whether there is a precise sequence of the various reviews, but it nevertheless is true that QCRs serve each process and that, in this sense, the processes are simultaneous and the forms serve dual purposes.

¶ 46    We conclude that the trial court's finding that the QCRs were requested by the quality-assurance committee as a standing practice and *solely* for its use was against the manifest weight of the evidence. The court's factual findings were made *before* the supplemental briefing concerning the policy-and-procedure manual, and the court did not revisit those findings, determining after the supplemental briefing that it did not "see a reason to depart from [its] decision." However, viewing the evidence as a whole and, most significantly, in light of the manual's provision that all QCRs are reviewed to assess whether there should be follow-up from a risk-management perspective, we hold that the court's finding was not reasonably based on the totality of the evidence. Given this conclusion, we turn to the case law to assess whether, given their dual purposes, the QCRs here are privileged.

¶ 47                           3. *Roach* and Incident-Report Cases

¶ 48    As noted, the Act has been construed to cover information generated during, but not before or after, a peer-review committee's engagement in such a review. *Ardisana*, 342 Ill. App. 3d at 748; *Webb*, 347 Ill. App. 3d at 825. The question here is whether the QCRs constitute information of defendant's peer-review committees where they were completed pursuant to a general standing order by such committees and for their nonexclusive use. In the following cases, the courts refused to hold that the documents were privileged where they consisted of reports that were not initiated and used exclusively by peer-review committees for peer-review or quality-assurance purposes and/or where the defendants had classified the documents *in advance* as peer-review or quality-improvement materials.

¶ 49    The supreme court case most relevant here is *Roach*, a preamendment case. In *Roach*, the supreme court determined that the Act's protection runs to the information of peer-review committees, not hospital medical staff, and that the information is not transformed into "information of" a peer-review committee merely because it is *later* reported to such a committee. *Roach*, 157 Ill. 2d at 38-41. The supreme court declined to impute an anesthesiology chair's actions to his department merely because he served as its chair. *Id.* at 42-43. It noted that, although the hospital's bylaws stated that the chair was ultimately accountable for all activities within the department, it was the *department* that was charged with conducting medical reviews at monthly meetings, and the bylaws contained *no* provision conferring on any individual the authority to act for the department in conducting interviews or investigations "preliminarily to the review process." *Id.* at 43.

¶ 50    Most relevant here, the court further stated:
        "If the simple act of furnishing a committee with earlier-acquired information were sufficient to cloak that information with the statutory privilege, a hospital could effectively insulate from disclosure virtually all adverse facts known to its medical staff, with the exception of those matters actually contained in a patient's records. As a result, it would be substantially more difficult for patients to hold hospitals responsible for their wrongdoing through medical malpractice litigation. So protected, those institutions would have scant incentive for advancing the goal of improved patient care. The purpose of the [A]ct would be completely subverted." *Id.* at 41-42.

¶ 51    Here, the trial court found *Roach* distinguishable because the investigating physician in that case acted in a somewhat *ad hoc* manner, based on job responsibilities that only generally included quality control, whereas, in this case, the peer-review committee had specifically requested that QCRs be completed for medical occurrences. The trial court also noted that

- 10 -

*Roach* was decided before the 1995 amendment that extends the statutory protection to information of committees or their designees. We agree with the trial court's analysis of *Roach*. However, *Roach*'s warning concerning the implications of a policy that predeclares that certain documents come within the statute's purview is well taken.

¶ 52 The trial court further found that several other cases, the so-called incident-report cases upon which plaintiffs rely, were distinguishable because the documents at issue were not initiated and used *exclusively* by a peer-review committee for peer-review or quality-improvement purposes. We disagree because, as noted, the documents here served dual purposes: peer-review and risk management (*i.e.*, anticipation of litigation). Also significant is that two cases (*Lindsey* and *Chicago Trust*) follow *Roach* and appear to preclude policies that declare in advance that certain documents are peer-review materials, an approach that defendant refers to as a chronology bar.

¶ 53 In *Chicago Trust*, a case that does not discuss the 1995 amendment, the reviewing court rejected the suggestion that a hospital oversight committee "can invoke the Act's protection by declaring in advance that all incident documents prepared by [hospital] staff are part of the peer-review process." *Chicago Trust*, 298 Ill. App. 3d at 406. The court stated that such a position "goes too far" and that such a policy "would swallow the rule" and "make everything confidential, except for the patient's own medical records." *Id.* Also, *some* of the reports in that case were used in part to help formulate legal opinions. *Id.* at 404; see also *Lindsey*, 2017 IL App (2d) 160042, ¶¶ 13-17 (in negligence action against nursing home, court construed Quality Assurance Act by looking at Medical Studies Act case law and held, following *Roach* and *Chicago Trust* and without discussing 1995 amendment, that internal quality-assurance investigation reports relating to incidents or accidents involving resident injuries and required under nursing home's quality-assurance process for consideration only by the quality-assurance committee were not privileged; case law instructed that a policy "declaring in advance" that reports are part of peer-review process " 'goes too far' " (quoting *Chicago Trust*, 298 Ill. App. 3d at 406) as they constitute earlier-acquired information; also, reports were made before any peer-review committee met); *Pietro*, 348 Ill. App. 3d at 548-50 (in negligence action against assisted-living facility, without discussing 1995 amendment, court held in the alternative that, if Act applied, resident-care committee was not of the type envisioned by the Act because it included persons whose job did not relate to such function; further, handwritten statements by nurse and resident assistant concerning an incident were not privileged because it was unclear if quality-assurance committee ever met to render an opinion on the subject incident and, when the statements were prepared, no formal committee had convened or requested the statements[2]); *Webb*, 347 Ill. App. 3d at 826-28 (affirming finding that documents were not privileged under the Act without discussing amendment; documents included an occurrence summary, four memoranda summarizing interviews with doctors, and a statement that reflected that they were created, at least in part, to weigh potential liability risk, not solely for peer-review; also, the record did not reflect the timing of the peer review); *Dunkin v. Silver Cross Hospital*, 215 Ill. App. 3d 65, 68 (1991) (in negligence case against hospital for slip-and-fall accident by nonpatient, court held that hospital incident reports that

---

[2]Although not relied upon by the reviewing court in its analysis, we further note that the incident documents were prepared for both the peer-review process and in anticipation of litigation. *Id.* at 544-45.

recorded unusual incidents at hospital and were used in analyzing problem areas and determining steps to improve quality of care and service were not privileged; reports did not relate to patient medical care in "the sense that the legislature was concerned about" and were "the same kind of incident reports which any business might have"; reports were used primarily by hospital's quality-assurance department, and information therefrom and corrective-action plans could have been disseminated to any of 70 different departments).

¶ 54　　Defendant asks that we not apply a strict chronology bar to the application of the privilege to the QCRs, because the peer-review and quality-assurance goals will be frustrated where personnel cannot immediately prepare such reports to ensure that the QA/I is provided with candid, real-time, and firsthand information in carrying out its duties. Attempting to distinguish *Lindsey* and *Chicago Trust*, defendant urges that it is not arguing that it can *declare in advance* that *every* conceivable document pertaining to a patient's care, except the patient's medical records, is privileged under the Act. Rather, it asserts that its claim of privilege applies only to the three QCRs at issue here, which the QA/I proactively determined were to be completed by the nurses as soon as the predefined "medical occurrence" happened, rather than delaying such information-gathering for weeks or months until a scheduled committee meeting. Defendant also contends that, if it instead waited until the committee met to request that the nurses complete the QCRs, the documents would indisputably be privileged under the statute. The fact that it decided to expedite the process by issuing a standing order that a QCR be completed as soon as a medical occurrence happens, it urges, should be a distinction without a legal difference.

¶ 55　　Addressing *Lindsey,* this court's most recent case on this issue, plaintiffs respond that, like the documents in that case, the QCRs here were created in the ordinary course of defendant's business. *Lindsey*, following *Roach* and *Chicago Trust*, rejected the notion that a defendant can declare in advance that incident documents are part of the peer-review process. *Lindsey*, 2017 IL App (2d) 160042, ¶ 15. Plaintiffs also argue that QCRs are created for a variety of incidents and are sent to the risk-management department for appropriate follow-up, which is not within the Act's purview.

¶ 56　　We find unconvincing defendant's argument that it is seeking to have only the three QCRs at issue declared privileged because the relevant aspects of the QCRs and defendant's quality program apply to all medical-occurrence QCRs and our holding, although specifically directed to the QCRs at issue, would be read more broadly. Defendant is essentially seeking statutory protection for all patient-care documents, with the exception of patients' medical records, in cases where there is a medical occurrence. This implicates the policy concerns expressed in *Roach* and echoed in *Chicago Trust* and, more recently, by this court in *Lindsey*. Although defendant's point that its quality program seeks to proactively collect real-time information concerning hospital incidents and should not be fatal to its case is well taken, our supreme court and subsequent appellate decisions, as noted, have rejected such an approach.

¶ 57　　　　　　　　　　　　　　　　4. *Ardisana*, *Kopolovic*, and *Berry*

¶ 58　　Defendant next relies on *Ardisana*, which plaintiffs do not address (nor did the trial court), and attempts to distinguish *Kopolovic* and *Berry*, upon which the trial court relied.

¶ 59　　In *Ardisana*, the First District held that the following documents were privileged on the basis that they constituted recommendations, not results, used in the course of internal quality control: (1) pages of a surgical-department quality review, which contained a committee

- 12 -

conclusion; (2) a page of the minutes of a general-surgery-quality-measurement-and-improvement (QMI) conference, which contained two conclusions; (3) the indication of conclusions in an anesthesia quality-management worksheet; and (4) a letter from the anesthesia department chair to an anesthesiologist, seeking additional information for a peer review. *Ardisana*, 342 Ill. App. 3d at 747.

¶ 60     The *Ardisana* court also determined, on a second basis, that the documents were privileged because they "served an integral function in the peer-review information-gathering and decision-making process"; and it noted that an affidavit showed that they *were generated in the process of investigations by the committees and solely for their use*. *Id.* at 748. Specifically, the minutes of the surgical-audit committee and the general-surgery QMI committee, in which the plaintiff's case was addressed, "self-evidently constitute[d] 'investigative and deliberative materials generated by a hospital committee in formulating its recommendations.' " *Id.* at 749 (quoting *Green v. Lake Forest Hospital*, 335 Ill. App. 3d 134, 138 (2002)). As to certain quality-management/improvement worksheets, they were privileged because their content reflected that they were authored for a peer-review committee's use. *Id.* The letter from the anesthesia department chair to the anesthesiologist was also privileged because it requested, on the committee's behalf, additional information to be used by the committee in its *ongoing* investigation. *Id.* The court noted that the fact that the letter was "to an individual outside of the committee proper does not compromise its privileged status, since disclosure of information privileged under the Act has no effect on its nondiscoverability." *Id.*

¶ 61     Here, defendant contends that, as in *Ardisana*, the QCRs were authorized by the QA/I committee, were prepared pursuant to "established screening criteria" (*i.e.*, defined medical occurrences), were "authored for the use of a peer-review committee," and "served an integral function" in that process. As noted, the trial court did not specifically address *Ardisana*. We do not find it particularly helpful because, unlike the QCRs, the documents in that case were prepared and used solely for peer-review purposes or constituted recommendations or internal conclusions. *Id.* at 747-49. As to the latter, defendant does not argue that there are any indications of any conclusions in the QCRs.

¶ 62     Defendant next maintains that *Kopolovic* and *Berry*, which the trial court found controlling, are distinguishable and that *Kopolovic*, which the trial court described as defendant's "most conspicuous obstacle," ignored the 1995 amendment that added "or their designees" to the statute.

¶ 63     In *Kopolovic*, without discussing the 1995 amendment, we held that a memorandum written by an anesthesiologist who was not a member of any peer-review or quality-control committee, expressing his concerns about alleged deception concerning a recent surgical procedure by a plastic surgeon, was not privileged under the Act. *Kopolovic*, 2012 IL App (2d) 110383, ¶ 36. The letter was written at the suggestion of the president and another member of the board of the defendant surgical center, and it was addressed to the board, the consulting committee (the center's peer-review and credentialing committee), and the surgeon. We rejected the anesthesiologist's argument that the memorandum was privileged because he sought to bring to light practices that he viewed as unethical. *Id.* ¶ 22. We noted that the case law (*Roach* and *Grandi*) held that the privilege applied to information generated or created by a committee *already engaged* in the peer-review or quality-control process with regard to the incident at issue. *Id.* ¶¶ 24-26. Even though the content of the information was in harmony with the promotion of quality control, it could not be privileged where it was not generated by a

committee of the type described in the statute. *Id.* ¶ 26. We also rejected the physician's argument that, because he was advised to write the memo by members of the board, he was engaged in ongoing quality control and, thus, the memo must be considered information of the board. *Id.* ¶ 27. We expressed two reasons for our holding. First, citing *Roach*, *Berry*, and *Anderson*, we noted chronology. Specifically, we determined that, when the memo was written, the board was not already engaged in the peer-review or quality-control process regarding the incident at issue. *Id.* ¶¶ 28-30. Second, relying on *Roach* and *Pietro*, we concluded that the actions of individual board members are not actions of the committee as a whole, and the evidence did *not* reflect that the board members were *authorized* by the board to investigate, "outside the review process conducted at monthly meetings," the anesthesiologist's concerns before he wrote his memo. *Id.* ¶¶ 31-32; see also *Berry*, 338 Ill. App. 3d at 57 (without discussing 1995 amendment, First District held that Act's privilege did not apply to physician's letter to chairperson of hospital's obstetrics and gynecology department, informing the chair of events concerning patient's medical condition and treatment; although letter was written in response to established hospital policy that staff notify peer-review committee of potential issues, court rejected the suggestion that the physician acted on committee's behalf because committee was not aware of the problem until it received the letter and it did not meet until several months afterward; court held that the letter was not privileged where it was not "initiated, created or generated by a peer-review committee" and was "written prior to the commencement of the peer-review process as a means to bring to [chair's] attention a potential quality issue").

¶ 64 Here, the trial court determined that, in the narrow sense, defendant's QA/I did not request that the three nurses prepare their respective QCRs, but rather, in the general sense, the committee requested (via its quality-improvement plan) that such reports be completed. Acknowledging that this point supported defendant's argument that the nurses were committee designees, the trial court nevertheless determined that *Kopolovic*'s discussion and approval of *Berry*, where the court found that the privilege did not apply because the peer-review department was not aware of the incident at issue until after it received the physician's letter (*Kopolovic*, 2012 IL App (2d) 110383, ¶ 29 (citing *Berry*, 338 Ill. App. 3d at 56)), compelled a finding that the QCRs are not privileged. The trial court determined that, despite the fact that the QA/I had directed employees to prepare QCRs to bring potential issues to its attention for review, and despite the fact that the statute permits committees to act through designees, *Kopolovic* and *Berry* compelled a finding that the QCRs are not information of the QA/I and are therefore not privileged.

¶ 65 Defendant maintains that this case is close to *Ardisana*, but markedly different from *Berry*, *Kopolovic*, or *Roach*. It argues that the QA/I as a whole directed hospital personnel involved in certain events such as the one here to complete QCRs as its "designees" and submit them to the committee for its (or a subcommittee's) review. Thus, defendant urges, unlike in *Berry*, *Kopolovic*, or *Roach*, the QCRs were initiated by the QA/I and owe their existence to the committee as a whole. They are not independently created and then rerouted to the QA/I; they are quality-assurance documents from their inception. Defendant further argues that the QA/I committee as a whole proactively determined to undertake a quality review of any outpatient complication resulting in a hospital admission and that the committee designated the medical personnel involved in such an occurrence as its "designees" to commence that review process by completing and submitting QCRs. Thus, the QCRs are information initiated by a

- 14 -

peer-review or quality-assurance committee and they fulfilled their intended purpose here by initiating a quality-assurance process that culminated with no action being taken regarding any physician's privileges and no changes in defendant's policies or procedures.

¶ 66 Plaintiffs respond that *Kopolovic* is similar to this case. The QCRs, they argue, are also information of the hospital staff and not of the QA/I. Plaintiffs also argue that, as in *Berry*, the QA/I was not aware of Connie's bladder injury until after the QCRs were sent to the risk-management department, and the QA/I did not meet to discuss the incident until weeks after the QCRs were written. Thus, they conclude, the QCRs are not information of a peer-review or quality-assurance committee, but are, instead, information of the hospital staff.

¶ 67 We conclude that the trial court did not err in relying on *Kopolovic* and *Berry*. Notwithstanding the fact that in *Kopolovic* we did not discuss the 1995 amendment, we find it and the cases upon which it relied to continue to be good law. We acknowledge that the anesthesiologist in that case did not write his letter pursuant to a standing process whereby a peer-review or quality-assurance committee (and risk-management department) requested such information. Rather, he did it merely upon a suggestion by two board members who were not authorized to order such actions outside the established peer-review process. Similarly, the physician in *Berry* was not acting on the committee's behalf. However, it remains that these cases preclude application of the privilege to the QCRs because the designees who completed the QCRs had been so designated before the occurrence at issue.

¶ 68 Defendant next urges that extending the privilege to the QCRs is consistent with the 1995 amendment, which subsequent cases might have overlooked. The trial court, defendant points out, noted this possibility, but found that *Kopolovic* and *Berry* controlled. Defendant relies on *Eid*, a First District case that was decided after the trial court's decision in this case. In that case, the court held that information generated for use by a hospital peer-review committee was privileged where a committee designee, pursuant to his authority under hospital bylaws, began an investigation of a patient's treatment and instructed another committee member to collect information. *Eid*, 2017 IL App (1st) 143967, ¶ 39. Specifically, after a child died following surgery, the hospital's risk manager, who was also a member of the peer-review committee, began contacting individuals to preserve records. She also contacted the chair of the peer-review committee, who instructed her to investigate the incident on the committee's behalf, from a quality perspective. The chair averred that the committee directed and empowered individuals to assemble information about incidents and to report the information back to the committee for its use in evaluating and improving the quality of patient care. The risk manager, he further averred, was such a designee in this instance. The First District upheld the trial court's finding that the privilege applied to documents generated by the risk manager *after* she obtained the chair's directive on the committee's behalf. *Id.* The court noted that the 1995 amendment provided that " 'designees' " could create or generate information covered by the statute. *Id.* ¶ 43. Thus, if the risk manager and the chair were designees under the Act, the documents were privileged. *Id.* ¶ 44. In assessing this question, the court rejected the plaintiffs' argument that the privilege does not apply to information generated before the peer-review committee, *acting as a whole*, either becomes aware of an incident or is already engaged in the peer-review process. *Id.* ¶ 49. The court noted that the statute was amended after the *Roach* decision and that subsequent cases citing *Roach* either do not acknowledge the 1995 amendment or do not involve situations where an individual is authorized to act on behalf of a peer-review committee. *Id.* (citing *Chicago Trust*, *Pietro*, *Anderson*, and *Kopolovic*). The

court held that the privilege applied to the documents generated by the risk manager *after* she obtained the chair's directive on the committee's behalf, where the risk manager's and the chair's affidavits established that the committee was a peer-review committee covered by the Act and where the chair used his authority to commence the committee's investigation after being informed that the incident at issue might warrant peer-review proceedings. *Id.* ¶ 53.

¶ 69    *Eid*, thus, stands for the proposition that, where a member of a peer-review committee, acting on its behalf, authorizes an investigation by a designee into a potential quality issue on the committee's behalf, any documents generated thereafter as part of the investigation are privileged. It is distinguishable from this case because a designee was not declared in *Eid* until *after* the committee became aware of the incident and authorized the investigation. Also, *Eid* did not involve a standing request to collect *all* medical-occurrence information, which is also shared with the risk-management department to assess whether follow-up is required from a risk-management perspective.

¶ 70    Defendant also contends that a conclusion that the Act protects the QCRs is consistent with the statute's purpose and goal. It points to yet another case, namely, *Anderson*. In *Anderson*, we held that certain medical journal articles were privileged because they reflected a peer-review committee's "internal review process, including information gathering and deliberation." *Anderson*, 385 Ill. App. 3d at 175. The articles were not written by or for the hospital's peer-review committee or for its exclusive use, but they were located *at the committee's request*, were used as a resource in conducting a review, and focused on an issue arising from the care given to a patient. *Id.* We noted that the committee gave out literature-search assignments and reviewed the resulting information and that the information was addressed when an action plan was developed. *Id.* at 176. We distinguished case law that states that materials generated prior to the beginning of a peer-review process are not privileged. We noted that the articles did not reference the patient's care and, thus, could not contain any adverse facts known to the medical staff about the patient's care and frustrate the Act's goal. *Id.* at 176-77. However, we also noted that it was not the content of the articles that was significant, but the manner in which the committee used them and what their use would reveal about the committee's internal-review process. *Id.* at 178. Denying application of the privilege, we concluded, would frustrate the Act's goal by discouraging "medical personnel from openly discussing their colleagues' actions." *Id.* at 177-78.

¶ 71    Defendant asserts that we should scrutinize the QCRs "in light of the Act's purpose" (*id.* at 178) as reflected in the 1995 amendment, as properly applied in *Eid*, and hold that the QCRs are privileged both under the express provisions and according to the clear purpose of the Act.

¶ 72    Plaintiffs do not address *Anderson*, but they respond that designating every person who must complete a QCR, including every employee and visitor, as a designee of the QA/I subverts the Act's purpose. The term "designate" means "to indicate and set apart for a specific purpose, office, or duty." Merriam-Webster Online Dictionary, http://www.merriam-webster. com/dictionary/designate (last visited May 3, 2017). Plaintiffs note that defendant maintains that the nurses who completed the QCRs are designees of the QA/I. Plaintiffs argue that, if every person on defendant's premises is responsible for drafting QCRs, defendant is effectively not designating *any* specific person because no specific person is set apart from another. Plaintiffs maintain that it is even more absurd to assert that a hospital visitor can somehow be a designee of the QA/I. Also, plaintiffs argue that cloaking QCRs in the privilege in 1999, even those that would not be completed until 2013, gives defendant scant incentive for

- 16 -

advancing the goal of improved patient care. The Act's purpose would be subverted, they argue, by allowing hospitals to shield themselves from liability by declaring that certain documents are privileged before they even exist. Defendant replies that the statute does not require designees to be directly identified in advance and that, once a medical occurrence happens and QCRs are prepared, each designee's direct identity will be revealed, as it was here, and they are subject to being deposed about the incident.

¶ 73    We disagree with defendant that *Anderson* compels a holding that the QCRs are privileged. The *Anderson* committee's request was targeted at articles relating to the patient's care, and we held that their disclosure would reveal the committee's thought process. *Anderson*, 385 Ill. App. 3d at 175. In contrast, here, the QA/I and other committees have a standing blanket request to review *all* medical-occurrence QCRs. Thus, the concerns the *Anderson* court raised about revealing the committee's internal-review process are not present in this case.

¶ 74    As to plaintiffs' suggestion that defendant has effectively not designated any person, where any person on the premises can complete a QCR, we agree. But, even if the QA/I can designate a broad universe of designees, we conclude that the 1995 amendment does not undermine the case law that holds that the privilege applies only to information of such a committee (or, in this case, designee) where the committee (or designee) is *already investigating the incident at issue*. See *Kopolovic*, 2012 IL App (2d) 110383, ¶¶ 24-26 (noting that *Roach* and *Grandi* hold that privilege applies to information generated or created by a committee *already engaged* in the peer-review or quality-control process with regard to the incident at issue). To hold otherwise would allow an entity such as defendant to invoke the statutory privilege whenever *any* medical occurrence is memorialized in a QCR by *any* person (employee or nonemployee) who observed, heard, or otherwise had information concerning the event. Such a practice "swallow[s] the rule" and "make[s] everything confidential, except for the patient's own medical records." *Chicago Trust*, 298 Ill. App. 3d at 406. We believe that the legislature cannot have intended as broad a reading of the amendment as defendant proposes. Defendant's QCRs are, by definition, not commencing any investigation because the persons completing them, even if quality-assurance-committee designees, do not serve in that role. Defendant's policy-and-procedure manual states that QCRs "will be used to *communicate* occurrences or variances affecting patients, physicians, visitors, volunteers, students, employee property, and [defendant's] property." (Emphasis added.) The decision whether to *investigate* any incident is not made until *after* the completed medical-occurrence QCRs are forwarded to other personnel. For example, in the case of a sentinel event, the chief medical officer or the chief quality officer "or his designee will determine if a *** team should be convened to conduct an investigation[.]" All QCRs are sent to the risk-management department, which, according to the manual, "facilitate[s] follow-up, investigation, resolution, and data collection." In the section addressing billing, the policy manual instructs that responsibility for certain costs "can only be determined after investigation of the occurrence by Risk Management or their designee." Thus, in some general sense, the QCRs commence a process, but they clearly do not commence an investigation. This is necessarily so because the manual implies that not all QCRs will result in an investigation. We believe that our holding is consistent with the Act's purpose of effective medical-professional self-evaluation, while it is also mindful of the fact that the Act neither facilitates medical-malpractice prosecution nor shields hospitals from liability.

¶ 75     The fact that the QCRs do not commence an investigation, along with their dual purpose, compels a holding that the QCRs are effectively incident reports. Thus, in light of *Roach*, *Lindsey*, and *Chicago Trust*, which, along with *Kopolovic* and *Berry*, preclude designating in advance that certain materials are generated by and for a quality-assurance or peer-review committee, and in light of the case law holding that the privilege does not apply where the materials are used for the dual purposes of quality assurance and risk management (*e.g.*, *Webb*, *Chicago Trust*), we conclude that the QCRs are not privileged.

¶ 76                              C. Contempt Finding

¶ 77     Finally, defendant requests that we vacate and/or reverse the trial court's contempt finding against it. In the trial court, defendant sought and obtained a "friendly" contempt order, which is recognized as "a proper procedure to seek immediate appeal of a trial court's discovery order." (Internal quotation marks omitted.) *Anderson*, 385 Ill. App. 3d at 185. Plaintiffs do not dispute, and we agree, that defendant brought this appeal in good faith and that defendant was not contemptuous of the trial court's authority. Accordingly, we vacate the trial court's contempt order and fine. *Id.* at 186.

¶ 78                              III. CONCLUSION

¶ 79     For the reasons stated, the judgment of the circuit court of Winnebago County is affirmed in part and vacated in part.

¶ 80     Affirmed in part and vacated in part.

- 18 -